BENEVOLENT & PROTECTIVE ORDER OF ELKS, LODGE NO. 65,
& others [1] *vs.* PLANNING BOARD OF
LAWRENCE & others [2]
(and two companion cases [3]).

Essex.   September 15, 1988. — December 13, 1988.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Eminent Domain,* Purpose of taking, Validity of taking. *Urban Renewal.*
*Redevelopment of Land. Jurisdiction,* Redevelopment of land, Judicial
review. *Administrative Law,* Judicial review, Standing, Regulations.
*Practice, Civil,* Standing. *Constitutional Law,* "Anti-aid" amendment.
*Open Meeting Law. Municipal Corporations,* Open meetings. *Civil
Rights,* Coercion.

Where the plaintiffs in a civil action challenged the validity of a taking of
land for an urban renewal project on the ground that the taking was not
for a public purpose but instead was for the purpose of benefiting a
private college, the Superior Court had jurisdiction to review the actions
of the Executive Office of Communities and Development in reviewing
and approving the plan. [536-538].

There was no prejudicial error in the standard of judicial review applied by a
judge hearing a challenge to the actions of local and State authorities in
adopting and approving an urban renewal plan pursuant to G. L. c. 121B.
[538-539].

In an action seeking judicial review of governmental proceedings culminat-
ing in the adoption and approval of an urban renewal plan pursuant to
G. L. c. 121B, the judge was warranted in concluding that substantial
evidence before the local redevelopment authority supported the author-
ity's determination that the area of the proposed project was a "blighted
open area" as defined by G. L. c. 121B, § 1. [539-543].

In an action seeking judicial review of governmental proceedings culminat-
ing in the adoption and approval of an urban renewal plan pursuant to

---

[1] Harold J. Brooks and Wilfred L. Cyr. Ryder Truck Rental, Inc. (Ryder),
and Andover Business Park, Inc. (ABP), each were allowed to intervene.

[2] Lawrence Redevelopment Authority and the Secretary of the Executive
Office of Communities and Development.

[3] Arthur F. Hayes & others *vs.* City of Lawrence & another and Benevolent
& Protective Order of Elks, Lodge No. 65, & others *vs.* Allen E. Koenig
& others.

G. L. c. 121B, substantial evidence supported the judge's conclusion that a city's planning board had complied with G. L. c. 121B, § 48, in finding that the plan was "based upon a local survey" and conformed to a "comprehensive plan for the locality as a whole." [543-544]

On a claim seeking judicial review of the approval of an urban renewal plan pursuant to G. L. c. 121B, § 48, by the Executive Office of Communities and Development, the plaintiffs, owners of land located within the area of the proposed urban renewal project, lacked standing to challenge the executive office's statutory finding that the financial plan for the project was sound; they did, however, have standing to obtain review of those findings that concerned the eligibility of their property for urban renewal. [544-546]

A judge did not err in upholding a determination by the Executive Office of Communities and Development concurring in findings by a city's planning board that a certain urban renewal plan for elimination of a blighted open area was based upon a local survey and conformed to a comprehensive plan for the locality as a whole. [546-547]

A certain urban renewal plan, undertaken pursuant to G. L. c. 121B and applicable regulations of the Executive Office of Communities and Development for elimination of a blighted open area, properly included the taking or restriction on use, as part of the proposed project, of certain parcels of land, themselves comprising less than thirty percent of the total project area, which were not of a "blighted-open" character, where there was substantial evidence before the Executive Office of Communities and Development justifying the inclusion of these parcels as necessary in order for the project as a whole to be viable and in order to achieve the objective of the project, namely, the sound, uniform development of a city's waterfront area. [547-549]

Where, on the basis of the agency record and the findings of the judge who heard an action seeking judicial review, this court concluded that the Executive Office of Communities and Development had fully considered the relevant information concerning a certain urban renewal plan, and would have approved the plan even if it had received certain information in the form its own regulations required, any formal defects in the agency's procedure were not prejudicial to the interests of the owners of land within the project area. [549-551]

In an action seeking judicial review of the governmental proceedings culminating in the adoption and approval of an urban renewal plan under G. L. c. 121B, the judge was warranted in concluding that the plan had as its predominant motive the elimination of a blighted open area, implicitly finding that there was no bad faith; neither the conduct of local authorities involved in the preparation of the plan nor the incidental benefit to a college, which had been invited to relocate to the project area before the plan was adopted, required a contrary conclusion. [551-553]

403 Mass. 531 533

Benevolent & Protective Order of Elks, Lodge No. 65, *v.* Planning Board of Lawrence.

A sale to a private party of land taken for an urban renewal project pursuant to G. L. c. 121B did not violate art. 46, § 2, as amended by art. 103 of the Massachusetts Constitution (the "anti-aid" amendment) where the sale price of the parcel, although less than the acquisition cost, was not less than its fair market value, taking account of the restrictions imposed by the urban renewal plan. [553-554]

Certain provisions of G. L. c. 121A, § 18C, requiring a charitable corporation that undertakes or acquires an urban renewal project under G. L. c. 121B, or any severable portion of such project, to waive its tax exempt status and make excise payments in lieu of property taxes, has no application where such a corporation, as redeveloper, obtains property within a c. 121B project subject to ongoing regulation by a redevelopment authority. [554-557]

A judge was without power to nullify action taken at a meeting of a governmental body held in compliance with the Open Meeting Law, G. L. c. 39, §§ 23A-23C. [557-558]

Neither the actions of local authorities in approving a proposed taking of land for an urban renewal project, nor statements by representatives of a private college seeking to relocate on the land, made in support of the takings, constituted any threat, intimidation, or coercion cognizable on a claim under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I, by the owners of land proposed to be taken. [558-560]

CIVIL ACTIONS commenced in the Superior Court Department on October 9, 1986; December 18, 1986; and February 26, 1987, respectively.

The cases were consolidated for trial and were heard by *John P. Forte*, J., sitting under statutory authority.

The Supreme Judicial Court granted a request for direct appellate review.

*Philip M. Cronin* (*Roger D. Matthews* with him) for the plaintiffs.

*Andrew P. Hier* (*Stephen Raube-Wilson* with him) for the city of Lawrence & others.

*Richard M. Brunell*, Assistant Attorney General, for the Secretary of the Executive Office of Communities and Development.

*Joyce Frank* for Allen E. Koenig & another.

HENNESSEY, C.J. The plaintiffs commenced actions[4] seeking to enjoin the taking by eminent domain, pursuant to the Riverfront Urban Renewal Project (project), of their land in Lawrence (city), and seeking damages for violation of their civil rights. The plaintiffs assert constitutional deficiencies and violations of statutory requirements in proceedings before local authorities[5] under G. L. c. 121B, § 48 (1986 ed.), and in the review and approval of the project by the Secretary of the Executive Office of Communities and Development (EOCD) under § 48. Additionally, the EOCD raises an issue of jurisdiction.

General Laws c. 121B (1986 ed.) provides a comprehensive scheme for the approval of an urban renewal plan. Section 46 places on a local urban renewal agency[6] the responsibility for determining what areas within its jurisdiction are decadent, substandard, or blighted open areas. The urban renewal agency is required to prepare an urban renewal plan in order to begin the process of redeveloping and improving these areas. After the urban renewal plan has been prepared, the local planning board must find that the plan is based on a local survey and con-

---

[4] The three separate actions were consolidated for trial. In the first of these actions, owners of land slated to be taken for the Riverfront Urban Renewal Project (project) alleged, inter alia, that the project violated G. L. c. 121B, § 48 (1986 ed.), G. L. c. 121A, § 18C (1986 ed.), art. 46, § 2, as amended by art. 103 of the Amendments to the Massachusetts Constitution (anti-aid amendment), and applicable State regulations.

In the second action, ten taxable inhabitants of Lawrence and others filed a complaint against the city, the mayor of Lawrence, and the Lawrence Redevelopment Authority (LRA), alleging, inter alia, that the defendants violated the open meeting law, G. L. c. 39, § 23B (1986 ed. & Supp. 1988), and the anti-aid amendment, and that the approved financing plan was contrary to applicable State regulations.

In the third action, the plaintiffs filed a complaint against Allen E. Koenig, the president of Emerson College, Emerson College; the LRA, and the city council of Lawrence pursuant to 42 U.S.C. § 1983 (1982) and the Massachusetts Civil Rights Act, G. L. c. 12, § 11I (1986 ed.).

Prior to trial, the judge accepted with prejudice the notices of voluntary dismissal filed by ABP of its claims in each action. Prior to oral argument before this court, Ryder and Cyr filed notices of voluntary dismissal of their appeals.

[5] The "local authorities" who performed statutory functions were the planning board of Lawrence (planning board), the LRA, and the city council.

[6] The LRA is an urban renewal agency. See G. L. c. 121B, § 9 (*a*).

forms to a comprehensive plan for the area as a whole. Approval of the plan by the city council then is required after a public hearing. After local approval, the Department of Community Affairs (department) reviews the plan. The department must concur in the local planning board's findings, and determine that the urban renewal plan is sufficiently complete and the project area is an appropriate subject for renewal. When the department gives its approval, the local urban renewal agency may undertake the project. See G. L. c. 121B, §§ 46-48.[7]

The project consists of three major parcels: (1) a park of approximately forty-seven acres fronting the Merrimack River to be created by the Department of Environmental Management; (2) a parcel designated for educational and recreational use of some eighty-five acres running from the park parcel to Andover Street. Emerson College has an agreement with the redevelopment authority to purchase this parcel; (3) a new major transportation connector between the new riverfront park and college campus and downtown Lawrence, to be built by the city.[8] The proponents of the plan state that by improving a large tract of riverfront land "the Riverfront Urban Renewal Project is expected to address the problems of a blighted open area and provide a catalyst for development and economic revival in Greater Lawrence."

---

[7] The Department of Community Affairs is a subdivision of the EOCD. See 751 Code Mass. Regs. § 7.02 (1986). In this case, the Secretary of the EOCD reviewed and approved the department's action. The parties throughout these proceedings refer to the requisite State agency as the EOCD, and accordingly we do the same.

[8] A plan, appended hereto as Appendix A, shows the existing use and ownership of the land within the project area. The project area includes approximately 152 acres situated in the southern section of the city on the south bank of the Merrimack River. The plaintiffs own the following parcels within the project area: Ryder owns a 4.4 acre parcel in the southwest corner of the project immediately north of property occupied by Digital Equipment Corporation (Digital) which fronts on Andover Street; ABP owns a 26.5 acre parcel which is bordered on the west by the Andover-Lawrence line and extends north from the Ryder parcel to the Merrimack River; the Elks own a 13.9 acre parcel which is immediately east of the Ryder and ABP parcels and which extends from Andover Street on the south toward the Merrimack River on the north; Cyr owns three parcels totalling some ten acres which front on Andover Street — two of the parcels are leased

It is undisputed that Lawrence, as compared to other Massachusetts cities, has had serious economic difficulties. Unemployment has been and continues to be above the State and Federal averages and welfare caseloads continue to be on the rise despite the efforts of the State government.

The plaintiffs sought review in the Superior Court of the approval of the project by the local authorities and the EOCD. After a trial commenced, the judge in the Superior Court granted summary judgment on the civil rights claims for the defendants in the third action. Trial concluded on the remaining claims and the judge entered judgments for all defendants. The plaintiffs appealed. We granted their application for direct appellate review, and now affirm the judgments.

1. *Jurisdiction.*

We first address the EOCD's claim that the Superior Court lacks jurisdiction to review the approval of an urban renewal plan. We have consistently stated that courts may review the purpose for which land is taken. *Luke* v. *Massachusetts Turnpike Auth.*, 337 Mass. 304, 308 (1958). *McAuliffe & Burke Co.* v. *Boston Hous. Auth.*, 334 Mass. 28, 30-31 (1956). *Burnham* v. *Mayor of Beverly*, 309 Mass. 388, 390 (1941). Here, the plaintiffs claim the taking was not for a public purpose, the redevelopment of a blighted open area, but instead was for the purpose of relocating Emerson College. Judicial review is available for such a claim.

Although G. L. c. 121B does not expressly grant the Superior Court jurisdiction to review the actions of the EOCD and local

---

to the New England Telephone & Telegraph Company (New England Telephone), the third is leased to the Bank of New England; and Brooks owns a 51.2 acre parcel which is bordered on the south by Andover Street and the three Cyr parcels, on the west by the Elks' parcel, and on the north by the Merrimack River.

Appendix B is a plan illustrating the land use under the proposed project. The land to be taken for the project includes all of the Ryder acreage, all of ABP's acreage, all of Brooks' acreage, 9.6 acres from the Elks, 7.4 acres from Cyr, and approximately nine acres from various owners who do not object to the project.

authorities,[9] this absence of an express grant does not immunize these actions from judicial scrutiny, as the EOCD contends. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 53 (1977); *West Broadway Task Force, Inc.* v. *Commissioner of the Dep't of Community Affairs*, 363 Mass. 745, 750 (1973). Similarly, the legislative nature of the findings by the local authorities and the EOCD, see, e.g., *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 143 (1972), and the absence of a statutory requirement that the EOCD explain its findings, see G. L. c. 121B, § 48, do not indicate a legislative intent to preclude review. These factors indicate a legislative scheme which provides for less rigorous judicial scrutiny, rather than no judicial scrutiny. See *Boston Edison Co.*, *supra*. Cf. *Reid*, *supra*; *Moskow* v. *Boston Redevelopment Auth.*, 349 Mass. 553, 561 (1965), cert. denied, 382 U.S. 983 (1966); *Worcester Knitting Realty Co.* v. *Worcester Hous. Auth.*, 335 Mass. 19, 21-22 (1956); *Bowker* v. *Worcester*, 334 Mass. 422, 434 (1956); *Despatchers' Cafe, Inc.* v. *Somerville Hous. Auth.*, 332 Mass. 259, 261-262 (1955); *Stockus* v. *Boston Hous. Auth.*, 304 Mass. 507, 509-511 (1939).

The EOCD's reliance on our decision in *Cummings* v. *Secretary of the Executive Office of Envtl. Affairs*, 402 Mass. 611 (1988), is misplaced. Although in *Cummings* we stated that the Superior Court lacked jurisdiction to review the Secretary's actions absent express statutory authority, we based our decision on a close reading of G. L. c. 214, § 7A, and G. L. c. 30, § 62H (1986 ed.). *Cummings*, *supra* at 613, 618. Such an analysis does not apply to a case, such as this one, where the plaintiffs challenge the validity of a taking. *McAuliffe &*

---

[9] General Laws c. 121B, § 47, grants the Superior Court jurisdiction to review an urban renewal agency's determination that an area is decadent, or substandard, or a blighted open area. A petition under § 47 is an aggrieved party's exclusive remedy for challenging this determination. *Id.* We have determined, however, that § 47 applies only where an urban renewal agency seeks to acquire land before the EOCD approves the urban renewal plan. *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 140 n.2 (1972). This situation is not present here, and none of the parties claims that § 47 provides the plaintiffs' exclusive remedy.

*Burke Co., supra. Luke, supra. Burnham, supra.* We therefore conclude that the Superior Court had jurisdiction over the plaintiffs' claims.

2. *Standard of Review.*

The LRA, planning board, and city council are not "agencies" for the purposes of G. L. c. 30A (1986 ed.) (see § 1 [2]), and are not required by the provisions of G. L. c. 121B, §§ 46-48, to furnish an adjudicatory, "trial-like" procedure. See *Sherman* v. *Rent Control Bd. of Brookline*, 367 Mass. 1, 7-8 (1975). Also, a proceeding before the EOCD is not an "adjudicatory proceeding" as defined in G. L. c. 30A, § 1 (1). *Reid, supra* at 142. Therefore, c. 30A, § 14, which provides the standard of review for an appeal from an agency's adjudicatory proceeding, does not apply.

The "arbitrary and capricious" standard generally governs judicial review of the specific statutory findings required by § 48. *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 52-53, 59 n.15 (1977). We stated in *Boston Edison Co.* that review of decisions in c. 121B redevelopment projects under the "arbitrary and capricious" standard is appropriate because such projects require active participation by public agencies and lack the tax benefits of c. 121A projects. *Boston Edison Co., supra* at 53.

The plaintiffs argue that we should judge the public agencies' actions by the substantial evidence test. They argue generally that the "arbitrary and capricious" standard is too deferential to agencies involved in urban renewal decisions and argue specifically that the influence of consultants and the incentives the project offered to Emerson College nullified G. L. c. 121B's scheme of checks and balances and require application of the substantial evidence test. The agency decisions challenged in this case were not made after adjudicatory hearings, and thus there are no agency records to which the substantial evidence test could be applied in its traditional form. We are not at all certain in the circumstances of this case that there is a significant difference between agency action that is arbitrary and capricious because its decision was not supported by facts, and agency action not supported by substantial evidence. Here, the

judge applied the "arbitrary and capricious" standard (and ruled it was met) and further ruled that, in any event, the challenged findings of the planning board, the LRA, and the EOCD[10] satisfied what he described as the more rigorous substantial evidence standard, based on the material that was before each agency when it made its determination. Even if we were to accept the plaintiffs' arguments that there was error in the judge's rulings as to standard of review, clearly there was no prejudicial error in the judge's application of the standard of review.

### 3. *The LRA's Finding of a Blighted Open Area.*

Exercising the power of eminent domain is improper unless the taking is for a public purpose. *Sellors* v. *Concord*, 329 Mass. 259, 261 (1952). See *Papadinis* v. *Somerville*, 331 Mass. 627, 629 (1954); art. 10 of the Massachusetts Declaration of Rights. Taking for redevelopment an area which is a "blighted open area" as defined by G. L. c. 121B, § 1,[11] is a public

---

[10] The judge found that the evidence which supported the EOCD's approval of the project's financial plan was not substantial. We conclude, however, for the reasons discussed below, that the plaintiffs do not have standing to challenge this particular agency finding.

[11] General Laws c. 121B, § 1 (1986 ed.), provides in part: "'Blighted open area,' a predominantly open area which is detrimental to the safety, health, morals, welfare or sound growth of a community because it is unduly costly to develop it soundly through the ordinary operations of private enterprise by reason of the existence of ledge, rock, unsuitable soil, or other physical conditions, or by reason of the necessity for unduly expensive excavation, fill or grading, or by reason of the need for unduly expensive foundations, retaining walls or unduly expensive measures for waterproofing structures or for draining the area or for the prevention of the flooding thereof or for the protection of adjacent properties and the water table therein or for unduly expensive measures incident to building around or over rights-of-way through the area, or for otherwise making the area appropriate for sound development, or by reason of obsolete, inappropriate or otherwise faulty platting or subdivision, deterioration of site improvements or facilities, division of the area by rights-of-way, diversity of ownership of plots, or inadequacy of transportation facilities or other utilities, or by reason of tax and special assessment delinquencies, or because there has been a substantial change in business or economic conditions or practices, or an abandonment or cessation of a previous use or of work on improvements begun but not feasible to complete without the aids provided by this chapter, or by reason of any combination of the foregoing or other condition; or a predominantly open area which by reason of any condition or combination of conditions

purpose. G. L. c. 121B, § 45. *Opinion of the Justices*, 334 Mass. 760, 763 (1956). See *Papadinis* v. *Somerville, supra* at 631-632. Chapter 121B, § 2, presents alternative definitions of a "blighted open area." The area need satisfy only one of these definitions. The provision of G. L. c. 121B, § 1, under which the judge examined the LRA's determination that the project area is "blighted-open" provides that a blighted open area is "a predominantly open area which by reason of any condition or combination of conditions which are not being remedied by the ordinary operations of private enterprise is of such a character that in essence it is detrimental to the safety, health, morals, welfare or sound growth of the community in which it is situated." Thus, for the taking properly to have a public purpose, it must satisfy these statutory requirements.

The plaintiffs claim that the judge misconstrued the requirements of § 1 and therefore erroneously found that substantial evidence supported the determination that the project area is blighted-open. According to the plaintiffs, the judge determined that the predominantly vacant condition of the area, by itself, satisfied the statutory requirement of blighted-open. We agree that land is not blighted-open under G. L. c. 121B, § 1, merely because it is vacant. The plaintiffs, however, misinterpret the judge's reasoning.

The judge addressed each component of G. L. c. 121B, § 1, and found that the LRA based its determination that the project area is blighted-open on substantial evidence. The record supports his conclusion. The judge found that the LRA had available to it a report entitled "Code 200 — Project Area Report" (report) prepared for it by the Logue Development Company (Logue consultants). Although the judge noted that the report contained some inaccuracies,[12] he found that the documents on which the report was based, and which were available to the LRA, contained accurate information. The report described

---

which are not being remedied by the ordinary operations of private enterprise is of such a character that in essence it is detrimental to the safety, health, morals, welfare or sound growth of the community in which it is situated."

[12] He found that the errors involved no bad faith.

the area as blighted and open. Although the statute does not define "predominantly open," 760 Code Mass. Regs. § 12.01 (1986) states that, "[a] 'blighted open' area eligible for Urban Renewal is one which is not more than thirty percent (30%) built up." Land which "contains buildings or other improvements" is "built up." *Id.* The project area comprises approximately 152 acres. The combined area of the parcels which have buildings on them, the Digital parcel, the Ryder parcel, the Elks' parcel, the Bank of New England parcel, and the two New England Telephone parcels, is approximately thirty-three acres, which is less than thirty percent of the total project area. There was no error in the judge's finding that the LRA reasonably could have determined that the area was predominantly open.

The judge evaluated the § 1 requirement that the area contain a condition or conditions "detrimental to the . . . sound growth of the community." The report contains substantial evidence indicating that the condition of the project area is detrimental to the sound growth of the city. The report demonstrates that the project area lacks sufficient street capacity to support further development, to create a link to downtown Lawrence from interstate Route 93 as a plan entitled, "Program Community Action — Lawrence 1970" (1970 plan) suggested, or to lessen traffic congestion in the neighborhood. The report also indicates that soil, subsoil, surface water, and water table conditions necessitate site development costs. Wetlands comprise twenty percent of the proposed campus site, and fifty-four percent of that site lies within the 100-year flood plain. Fifteen percent of the site contains either bedrock which may require blasting, refuse fill which requires disposal, unstable soils which require either pile foundations or soil improvement, or underground fuel storage tanks which require removal. In addition, the report demonstrates that the area had deteriorated because of low grade uses, random filling, and because relatively unrestricted dumping has occurred in certain areas. Finally, the report explains the planning goals of the 1970 plan, such as improving recreational facilities, educational facilities, and traffic patterns. The report illustrates how development of

the project area carries out these goals by increasing the public park created by the Department of Environmental Management from fifteen to forty-seven acres, providing for a college campus, and implementing the construction of a new highway. The report explains how the project will help to revitalize the economy of the city of Lawrence. A letter from State Senator Patricia McGovern which was before the LRA similarly states that: "This project will go a long way toward assuring a better future for Lawrence." There was substantial evidence before the LRA that the project area is in a condition detrimental to the sound growth of Lawrence, and the judge properly considered this component in his review.

There was substantial evidence before the LRA that the ordinary operations of private enterprise are not remedying the deteriorated condition of a majority of land within the project area. The report explains how the current development of the area, which is clustered along the more economic Andover Street frontage, hinders the development of the potentially useful riverfront property. Current development, the report indicates, renders approximately 135 acres of developable land unusable. A December, 1986, memorandum prepared by the Logue consultants outlined the history of ABP's and Brooks' stalled attempts to develop their parcels. The memorandum explained that, although the Andover and Lawrence planning boards had approved ABP's subdivision plan, ABP still needed to submit proposals for each building to be approved by the planning boards and the conservation commissions. The memorandum also contained information that the Department of Environmental Management had received authority to take all of Brooks' property by eminent domain, and that, if Brooks were to construct, he would need at least one year to obtain the necessary permits and approvals. Thus there was substantial evidence concerning the history of the project area and its development to support a conclusion that the ordinary operations of private enterprise were not remedying the deteriorated and unused condition of a preponderance of the project area.

From the foregoing analysis, it is clear that the judge was warranted in concluding that there was substantial evidence

that the area is blighted-open and thus the judge properly concluded that substantial evidence supported the LRA's determination.[13]

4. *The Planning Board's Findings.*

Under G. L. c. 121B, § 48, a planning board is required to find that an "urban renewal plan is based upon a local survey and conforms to a comprehensive plan for the locality as a whole." The plaintiffs claim that the urban renewal plan underlying the project meets neither requirement. We disagree.

Chapter 121B does not define the phrase "comprehensive plan for the locality as a whole." The planning board determined that the project conformed to the 1970 plan. The plaintiffs claim that the planning board should have used, as the comprehensive plan, a 1960 master plan. No complete copy of this 1960 master plan is available, and the plaintiffs base their contention solely on a document entitled, "Summary Master Plan — Lawrence 1960." The Superior Court judge found substantial evidence that the 1970 plan the planning board used was comprehensive. To complete this plan, which took over three years to formulate, the planning board, with the aid of a Federal grant, compiled information from city departments, the Lawrence Housing Authority, the LRA, neighborhood groups, and numerous social agencies in the Lawrence area. In 1970, the planning board voted that the 1970 plan conforms in general to the master plan of the city of Lawrence. The plaintiffs' argument therefore must fail. There was substantial evidence to warrant the planning board's finding that the project conforms to a comprehensive plan for the locality as a whole.

Chapter 121B also does not define the term "local survey." The plaintiffs claim that the documents before the planning board did not constitute a local survey. We disagree. The judge

---

[13] Although the city council's approval of the project is essentially unchallenged, it follows from this conclusion that its approval was justified in this regard. We need not and do not rely on voluminous evidence which was presented before the judge and had not been presented before the LRA, and which supported various findings by the judge that the Elks, ABP, and Brooks had, by various actions and statements, in the past conceded that the preponderance of the property could not be developed without government assistance.

found that the planning board had before it the Cullinan Engineering Co., Inc., survey plans, the report, and maps attached to the riverfront urban renewal plan. The Cullinan survey, for example, shows the owners and deed references for each parcel within and abutting the project, the measurements for each parcel within the project, all encumbrances and easements, and all public ways. Expert witnesses for the Elks and Brooks testified that the Cullinan survey is a local survey. It was reasonable for the planning board to conclude that these materials constituted a local survey. Substantial evidence supports the judge's conclusion that the planning board complied with the requirements of G. L. c. 121B, § 48.

5. *The EOCD's Approval of the Project.*

The plaintiffs challenge the EOCD's approval of the project on numerous grounds. They claim that the EOCD (1) incorrectly approved the project's financial plan; (2) violated its regulations in concurring in the planning board's findings; (3) incorrectly allowed parcels which are not blighted-open to be included in the project area; and (4) failed to obtain information from the local authorities which would have reversed its finding that the project was in a blighted open area. We have examined each of these claims, and conclude that none has merit.

Before we examine these claims, however, we first address whether the plaintiffs have standing to challenge the EOCD's approval of the plan. The judge ruled that the plaintiffs' challenge was "essentially a challenge of the proposed expenditure of state funds" under G. L. c. 29, § 63 (1986 ed.). To restrain the expenditure of State funds under § 63, twenty-four State taxpayers must bring a petition before the Supreme Judicial Court or Superior Court. Because the plaintiffs did not meet these procedural requirements of § 63, the judge determined that they could not contest any of the EOCD's findings relating to the project. The judge, however, found that, even if the plaintiffs presented a proper petition under § 63, substantial evidence supported all findings by the EOCD except its finding that the financial plan was sound. The judge, therefore, found substantial evidence that the EOCD properly concurred in the planning board's findings; that private enterprise would not

make the project area available for urban renewal without either government subsidy or the exercise of governmental powers; that the proposed uses and requirements would afford the private sector opportunity to finance urban renewal consistent with the sound needs of the locality as a whole; that the project area is a blighted open area; that the plan is sufficiently complete; and that the relocation plan had been approved under G. L. c. 79A (1986 ed.). See G. L. c. 121B, § 48.

The plaintiffs claim that they have standing under G. L. c. 121B, § 48, as landowners to challenge the EOCD's actions. We agree that the judge erred in concluding that parties such as the plaintiffs may not challenge any of the EOCD's actions except as taxpayers under G. L. c. 29, § 63. The plaintiffs do have standing, for the reasons we discuss below, to challenge the EOCD's findings regarding their properties' eligibility for urban renewal as a blighted open area. The plaintiffs do not, however, have standing to challenge the EOCD's finding that the financial plan is sound.

"A party has standing when it can allege any injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." *Massachusetts Ass'n of Independent Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977). "An injury alone is not enough; a plaintiff must allege a breach of duty owed to it by the public defendant." *Northbridge* v. *Natick*, 394 Mass. 70, 75 (1985). The plaintiffs, as landowners, are not within "the area of concern" of the statutory requirement of a sound financial plan. See G. L. c. 121B, § 48. The Legislature's purpose in requiring a sound financial plan is to protect the State purse. If the EOCD approves a municipality's application for financial assistance with its urban renewal plan, the State may become obligated for a substantial portion of the net cost of the plan. G. L. c. 121B, §§ 54-57. The statute, therefore, requires that the EOCD ensure that the municipality's plan for meeting its share of the expenses is sound. The EOCD owes a duty to State taxpayers to ensure that the financial plan is sound, but it does not owe this duty to the plaintiffs as landowners. The United States Constitution, the Massachusetts Declaration of

Rights, and G. L. c. 79 (1986 ed.) fully protect the plaintiffs' rights as landowners to adequate compensation when their property is actually taken by eminent domain. The judge correctly determined that the plaintiffs lack standing to challenge the EOCD's finding that the financial plan is sound.

We conclude, however, that the plaintiffs do have standing to challenge the EOCD's findings which relate to the eligibility of their property for urban renewal under G. L. c. 121B, § 48. We have recognized that "[t]he private rights most clearly affected by proceedings under § 48 are those of owners and tenants of land in the project area." *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 142 (1972). A decision, for example, that property is blighted-open has direct impact on rights in that property. The plaintiffs, as land-owners, are "within the area of concern" of the statutory requirements which relate to the eligibility of the project area for urban renewal, and thus have standing to enforce these provisions. *Northbridge, supra* at 76. We therefore turn to the merits of these claims.

First, the plaintiffs claim that the EOCD violated its regulations by concurring in the planning board's findings. The plaintiffs contend that EOCD regulations in effect until December 12, 1986, which was after the planning board made its findings, but before the EOCD's concurrence, require that a local survey contain a detailed analysis of the structural conditions of buildings within a blighted open area. Even if we assume, as the plaintiffs argue, that these regulations control, we believe that the regulations apply where the purpose of the project is to redevelop a substandard or decadent area.[14] Such regulations

---

[14] Title 760 Code Mass. Regs. § 12.01 (1986) defines a "decadent" area as: "an area which is detrimental to the sound growth of a community as a result of the existence of buildings which are out of repair, physically deteriorated, unfit for human habitation, obsolete, or in need of major maintenance or repair, or because much of the real estate in recent years has been sold, or taken for nonpayment of taxes or upon foreclosure of mortgages, or because buildings have been torn down and not replaced and under existing conditions it is improbable that the buildings will be replaced, or because of a substantial change in business or economic conditions, or because of inadequate light, air, or open space, or because of excessive land

are inapplicable where the purpose of a project is to redevelop a blighted open area. The regulations govern the content of a survey, and essentially require an explanation, supported by maps, of how a project area meets eligibility requirements for urban renewal. 760 Code Mass. Regs. § 15.03 (1) (1978). No building deficiencies need be present for an area to meet the eligibility requirements of a blighted open area. See 760 Code Mass. Regs. § 15.01 (2) (b) (1978). Consequently, the local survey for the project, the purpose of which is to eliminate a blighted open area, does not need to contain a structural analysis of each building in the project area showing that each building is deficient. The final project report, which describes the nature and location of existing buildings, and states that no residences are involved in the project, provides sufficient information about the buildings. There was substantial evidence that the urban renewal plan was based on a local survey.

Moreover, because the EOCD had before it essentially the same information as the planning board, it was similarly justified in finding that the urban renewal plan conforms to a comprehensive plan for the locality as a whole. The judge did not err in upholding the EOCD's concurrence in the planning board's findings.[15]

Second, the plaintiffs claim that the EOCD's approval of the project is invalid because the project affects a number of parcels which admittedly are not blighted-open. The project empowers the LRA to take by eminent domain certain non-

coverage or because diversity of ownership, irregular lot sizes or obsolete street patterns make it improbable that the area will be redeveloped by the ordinary operations of private enterprise, or by reason of any combination of the foregoing conditions."

A "substandard" area is described as: "any area wherein dwellings predominate which by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, or any combination of these factors are detrimental to safety, health or morals." *Id.*

[15] The plaintiffs point out that EOCD regulations effective after December 12, 1986, require that a planning board certify a project area as blighted-open. Neither G. L. c. 41, § 81B, nor G. L. c. 121B, § 48, authorizes a planning board to make any finding that an area is blighted-open. We therefore reject the plaintiffs' argument that lack of certification by the planning board invalidated the approval of the project.

blighted-open parcels, and empowers it to impose restrictions on the use of other nonblighted-open parcels which are not to be taken, but which are included within the project area.[16] The plaintiffs apparently object both to the taking of the nonblighted-open parcels, and to the imposition of restrictions on the nonblighted-open parcels which are not to be taken. Neither of these claims has merit.

EOCD regulations provide that, "[i]f any sizeable portion of an area is not . . . blighted open its inclusion in the Urban Renewal Plan must be justified by one of the following: (1) Necessity of achieving urban renewal objectives for the total project area. (2) Necessity of bringing the project area to a sound boundary." 760 Code Mass. Regs. § 13.03.(5) (1986). The plaintiffs argue that the regulation requires an express finding of necessity by the EOCD, and that, even if no finding is required, the inclusion of nonblighted-open property in the project could not be necessary because the EOCD did not consider any alternatives.[17] Even if we assume that these parcels, which constitute less than thirty percent of the total project area, are a "sizeable portion" of the area, we do not accept the plaintiffs' argument. First, the regulation does not expressly require that there must be a finding of necessity in an urban renewal plan. In light of the findings and supporting data which an urban renewal plan must include, 760 Code Mass. Regs. § 13.03 (1986), such an additional finding would add nothing of substance. See *Boston Edison Co.* v. *Boston Hous. Auth.*, 374 Mass. 37, 63 (1977). Therefore, the plan

---

[16] The nonblighted-open parcels to be taken under the plan are the Ryder parcel and the two Cyr parcels leased to the Bank of New England and New England Telephone. The northern portion of the Elks' property, which for the purposes of argument we will assume is not blighted-open, is also to be taken. The nonblighted-open parcels which will be subjected to restrictions on use, but not taken under the project, are the remainder of the Elks' parcel, the parcel in the southwest corner of the project area owned by Andover Street Associates and leased to Digital, and the parcel on the southeast corner of the project area owned by Cyr and leased to New England Telephone. Compare Appendix A with Appendix B.

[17] The plaintiffs also argue that the LRA should have met these requirements. Because compliance with regulations by the EOCD will resolve the issue, we address only this aspect of the argument.

did not need to include an express finding on the necessity of including in the project property which is not blighted-open. Second, we interpret the word "necessity" in this context to mean necessary for sound planning purposes rather than, as the plaintiffs argue, necessary because no feasible alternatives exist.

Under this interpretation of "necessity," there was substantial evidence before the EOCD justifying the inclusion of the nonblighted-open property. The report described the nature and location of buildings in the project area and the maps included with the report indicated the division of the area into parcels. The Elks' parcel is situated between the two large, blighted-open Brooks' and ABP parcels. There was substantial evidence from which to determine that sound development of the blighted-open area of the Brooks' and ABP parcels would not take place unless the northern portion of the intervening Elks' property was taken. Similarly, there was substantial evidence justifying the decision to take by eminent domain the Ryder parcel, and the Cyr parcels leased to Bank of New England and New England Telephone, given the predominantly blighted-open nature of the riverfront area. Subjecting the remainder of the Elks' property, and the parcels leased to Digital and New England Telephone to restrictions on use was also reasonable. For the project as a whole to be viable, it was necessary to allow these parcels to be used only in ways compatible with use of the surrounding area as a college campus and park. On the basis of the evidence before it, it was reasonable for the EOCD to determine that inclusion of the nonblighted-open parcels was necessary to bring the project to a sound boundary, Andover Street, and necessary to achieve the objectives of the project, the sound, uniform development of the riverfront area. We therefore conclude that the parcels which are not blighted-open were properly included in the project area.

Finally, the plaintiffs claim that the EOCD, in violation of its regulations, failed to obtain information from the local authorities which would have reversed its finding that the project area is eligible for urban renewal as a blighted open area. The regulations the plaintiffs claim the EOCD disregarded required

information on the condition of buildings within the project area, a description of the area around the project area, and a justification of the project's boundaries. Noncompliance with these regulations, the plaintiffs contend, establishes arbitrary and capricious action as a matter of law. This argument has no merit. We conclude that, even if the EOCD had considered this information in the required form, and followed all technical requirements, it would have reached the same result. Consequently, as shown below, there was no prejudicial error.

We have stated consistently that "[o]nce an agency has seen fit to promulgate regulations, it must comply with those regulations." *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427 (1983). See *Restaurant Consultants, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 167, 170 n.8 (1987); *Northbridge* v. *Natick*, 394 Mass. 70, 76 (1985). Promulgated regulations have the force of law, and bind the agency. *Restaurant Consultants, supra. Royce, supra.* We have also reasoned, however, that "[t]here must be some showing of prejudice before an agency's disregard of its own rules may constitute reversible error." *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 262 (1987). *DaLomba's Case*, 352 Mass. 598, 603 (1967). After reviewing the record and the judge's findings, we conclude that the EOCD's disregard of its own regulations was not prejudicial to the plaintiffs. The Superior Court judge noted that all forms required by 760 Code Mass. Regs. §§ 12.00-20.00 (1986), which relate to a project's eligibility, had not been submitted to the EOCD. He found that substantial evidence nonetheless warranted the EOCD's finding that the project was eligible for urban renewal as a blighted open area. We agree. Although information concerning buildings in the project area was not in the form the regulations require, sufficient information on this issue was submitted to the EOCD. The final project report to the EOCD provided the location of existing buildings and sufficiently described the commercial nature of the buildings to be taken. This report also provided an adequate description of the surrounding area, and sufficient reasons for the project's boundaries. Furthermore, the EOCD's administrative record indicates that it fully considered the infor-

403 Mass. 531                                                  551

Benevolent & Protective Order of Elks, Lodge No. 65, *v.* Planning Board of Lawrence.

mation that landowners, including the plaintiffs, submitted at the March, 1987, public hearing.

We have determined that the judge correctly interpreted the G. L. c. 121B, § 1, definition of "blighted open area," and that substantial evidence supports the findings by the local authorities that the project area is a blighted open area. The same fundamental information was before the EOCD. We conclude that, even if the EOCD had followed its regulations and received all information in the correct form, it would have reached the conclusion that the project area is eligible for urban renewal as a blighted open area. Substantial evidence supports this conclusion. Because the plaintiffs can show no prejudice, we need not consider further their claim of error. *Martorano, supra* at 263.

6. *Bad Faith.*

The plaintiffs allege that the proposed taking is void because the local authorities acted in bad faith. The judge concluded that the predominant motive behind the project was to eliminate a blighted open area, and implicitly found there was no bad faith. The plaintiffs challenge this conclusion and, as grounds for their claim, first assert that the project on its face demonstrates bad faith because it benefits Emerson College by providing it with a favorable location on advantageous terms. This contention is without merit. We have suggested that "[t]here are certain motives or reasons that would be unlawful if they were the dominant reasons for [a] . . . taking." *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 777 (1987). The taking of land pursuant to a valid redevelopment plan is not void merely because the disposition of that land indirectly benefits private individuals. *Papadinis* v. *Somerville*, 331 Mass. 627, 632 (1954). See *Opinion of the Justices*, 334 Mass. 760, 764 (1956). Disposition to a private redeveloper of property acquired pursuant to a valid plan may be necessary to achieve the public purpose. *Papadinis, supra.* Any benefits this disposition may present to the redeveloper are incidental to the main purpose of the plan, which is the elimination of a substandard, decadent, or blighted open area. *Id.* See *Opinion of the Justices*, 332 Mass. 769, 783 (1955). We have concluded

in the instant case that there was substantial evidence to support the judge's finding that the project area was blighted-open. The project therefore has a public purpose and the benefit to Emerson College is incidental to this purpose. From these facts alone a conclusion that the local authorities acted in bad faith is not warranted, much less required.

Second, the plaintiffs argue that the judge was required to find a bad faith motivation for the project because Emerson College was invited to relocate to the riverfront area before the area was officially designated as blighted-open. We disagree. "In determining the state of mind of a person or group of persons, we consider not only what they have said but we also draw inferences concerning their intentions from what they have done and what they have not done." *Pheasant Ridge*, *supra* at 777. In examining a municipality's proposed exercise of the power of eminent domain for inferences of bad faith, we consider whether the municipality has evinced prior interest in the area or its neighborhood, and whether its method of acquiring the property accords with usual practices. *Id.* at 778. The judge found that the city and various elected officials expressed considerable interest in the project area before they learned of Emerson College's plans to relocate. City officials had exercised substantial efforts to aid Brooks, for example, in his attempts to develop the parcel; interest in constructing a riverfront park started as early as 1983; and the 1970 plan designated a portion of the project land as an improvement area. In light of this continuous prior interest in the riverfront area, the judge was not required to infer bad faith from the fact that political leaders discussed the site with Emerson College before the area was designated as blighted-open. See *Pheasant Ridge*, *supra* at 778; *Chelmsford* v. *DiBiase*, 370 Mass. 90, 93 (1976).

Furthermore, the local authorities did not deviate from usual practices in considering the riverfront urban renewal plan. The LRA, planning board, and city council considered the project in depth, and based their approvals on substantial evidence. In *Pheasant Ridge*, where we concluded that a taking was unlawful on the ground of bad faith, selectmen and town counsel

developed the purposes for the proposed taking within minutes before the commencement of the town meeting in which the taking was approved, and the town meeting voted to take the property without any consideration of the merits of the taking. *Id.* There is nothing in the record before us to show that the local authorities had any motive other than the performance of their public duty. See *Despatchers' Cafe, Inc.* v. *Somerville Hous. Auth.*, 332 Mass. 259, 263 (1955). The judge correctly concluded that the predominant motive behind the project was to eliminate a blighted open area and thus enhance the sound growth of the city of Lawrence. The actions of the local authorities required no adverse inferences.

7. *The Anti-Aid Amendment.*

The anti-aid amendment, art. 46, § 2, as amended by art. 103 of the Amendments to the Massachusetts Constitution, provides in part: "No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the Commonwealth or any political subdivision thereof for the purpose of founding, maintaining, or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the Commonwealth or federal authority or both . . . ." The language of the amendment is "clear and peremptory." *Opinion of the Justices*, 357 Mass. 836, 842 (1970). The purpose of art. 46 is to prevent the transfer of appropriated funds to nonpublic institutions. *Opinion of the Justices*, 374 Mass. 843, 856 (1978). The plaintiffs claim that selling parcel B of the project area to Emerson College as redeveloper violates the anti-aid amendment. Because the sale price is less than the city's cost to acquire the property, the plaintiffs argue that the sale involves a grant of public money to a nonpublic institution. We disagree. No public aid can be involved where a private institution pays fair market value for public property. *Opinion of the Justices*, 374 Mass. at 856-857. See *Brooks* v. *Boston*, 334 Mass. 285, 286 (1956). The judge, after considering the numerous restrictions the disposition agreement and the urban renewal plan imposed on

parcel B,[18] found that the sale price to Emerson College is the fair market value. The judge was entitled to rely on the disposition appraisal commissioned by the LRA, and the testimony of that appraiser. The LRA's appraiser considered comparable sales of residentially zoned land and took into account the restrictions the LRA placed on the property. The other appraisals introduced in evidence did not account for the decrease in value caused by the restrictions. Restrictions on use, development, and resale of property under an urban renewal plan affect the fair market value of property in much the same way as do easements, zoning restrictions, and other development restraints. The judge properly considered these restrictions, and his finding as to fair market value was warranted by the evidence. There was no violation of the anti-aid amendment. Because public funds are not being used to aid Emerson College, we need not analyze the proposed transaction in terms of the three criteria enunciated in *Commonwealth* v. *School Comm. of Springfield*, 382 Mass. 665, 675 (1981).

8. *The Applicability of G. L. c. 121A, § 18C.*

We next address the plaintiffs' contention that the riverfront urban renewal plan violates G. L. c. 121A, § 18C, and we conclude that § 18C does not apply to the plan. General Laws c. 121A, § 3, allows private individuals, through an entity approved by the EOCD, to commence a redevelopment project.

---

[18] The judge found that these restrictions included:

"1. All design, financial, site, construction plans and the performance bond require LRA approval.

"2. The redeveloper agrees to convey upon request 17 feet of frontage along Andover Street to an agency designated by LRA for the widening of Andover Street.

"3. The redeveloper agrees to construct the roadways through the redeveloper's land connecting Andover Street and South Broadway, the cost of which LRA will reimburse the developer.

"4. The conveyed property will be devoted only to and in accordance with the Project.

"5. In the event the redeveloper transfer[s] prior to completion any of the property the redeveloper will pay LRA the equivalent of all sums in excess of its costs for the land and improvements.

"6. In the event the redeveloper transfers at any time any portion or interest in the land, the redeveloper shall reimburse LRA Lawrence's share of the net Project Cost as certified by EOCD."

Under G. L. c. 121A, a private entity bears the responsibility for planning and initiating the project, and owns the project throughout its existence. *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 50 (1977). Private entities are granted tax concessions to encourage them to undertake c. 121A projects. G. L. c. 121A, § 10. See *Boston Edison Co.*, *supra.* In contrast, public agencies plan, initiate, and supervise projects conducted under c. 121B. *Id.* at 52. See G. L. c. 121B, §§ 46-49. Chapter 121B does not require tax concessions to private entities which may become involved in a c. 121B project. See G. L. c. 121B, § 16. The inducements c. 121A provides through required tax concessions are inappropriate in a c. 121B project because continuing public involvement lessens the strain on private redevelopers' resources.

Section 18C of c. 121A allows a private entity such as Emerson College either to "undertake" a c. 121A project or to "acquire" a project commenced under c. 121A or c. 121B.[19]

---

[19] General Laws c. 121A, § 18C (1986 ed.), provides in relevant part: "Individuals, and associations of persons organized in the commonwealth in the form of joint ventures, partnerships, limited partnerships or trusts, resident or organized in the commonwealth, or charitable corporations organized under chapter one hundred and eighty, may undertake projects under this chapter or acquire a project which has been authorized and approved and which has been developed or is being developed in accordance with the provisions of this chapter or chapter one hundred and twenty-one B or any severable portion of such project, including air rights or other interests in land therein, which project shall be exempt from taxation, betterments, excises and special assessments, provided that such persons or associations, with respect to any such project undertaken or acquired by them shall:

"  .   .   .   .

"(*f*) agree by regulatory agreement with the department of community affairs, or in Boston with the Boston Redevelopment Authority, that in consideration of exemption from taxation of real and personal property and from betterments and special assessments and from the payment of any tax, excise or assessment to or for the commonwealth or any of its political subdivisions on account of a project, they will pay the excises with respect to a project which a corporation would be bound to pay under the formulae and provisions set forth in section ten and any charitable corporation organized under chapter one hundred and eighty which enters into such a regulatory agreement shall be deemed to have waived its exemption from local property taxes."

To undertake a c. 121A project or to acquire a c. 121A or a c. 121B project, the private entity must agree to pay certain excise taxes in exchange for exemptions from real and personal property taxes. G. L. c. 121A, § 18C (*f*). To the extent of these payments in lieu of taxes, a charitable corporation is deemed to have waived its exemption from local property taxes. *Id.*

The plaintiffs argue that § 18C requires a charitable corporation that participates in any way in a c. 121B project to waive its tax exempt status and make excise payments in lieu of property taxes. Because the riverfront urban renewal plan does not specify that Emerson College is to make payments in lieu of taxes, the plaintiffs contend that the plan violates G. L. c. 121A, § 18C. The plaintiffs misconstrue the § 18C provision that a charitable corporation "acquire a project . . . or any severable portion of such project" conducted under c. 121B. G. L. c. 121A, § 18C. The phrase "acquire a project" does not apply where a redeveloper merely acquires land within a c. 121B urban renewal area which remains subject to ongoing regulation by a redevelopment authority.[20] Rather, the phrase applies to an entity's acquisition of a c. 121B project, or severable portion of such project, disengaged from the control of a redevelopment authority under c. 121B. The plaintiffs' attempt to read c. 121A, § 18C, into c. 121B leads to anomalous results. Under the plaintiffs' interpretation, any entity meeting the requirements of § 18C, such as a joint venture or a partnership, which acquires property in a c. 121B project, would obtain not only the burdens of c. 121A, § 18C, the excise payments, but also the benefits of § 18C, the tax exemption. Requiring tax concessions for such entities would restrict unreasonably the options open to redevelopment authorities operating under c. 121B. We therefore conclude that G. L. c. 121A, § 18C, does not apply where a redeveloper obtains

---

[20] If an "urban renewal agency" sells property it has acquired for urban renewal, G. L. c. 121B, § 49, requires the agency to subject the purchaser's use to certain ongoing restrictions. An agency, for example, is required to obligate a purchaser "to devote the land to the use specified in the urban renewal plan." G. L. c. 121B, § 49 (*a*).

property within a c. 121B project subject to ongoing regulation by a redevelopment authority.

Emerson College is not acquiring the riverfront urban renewal project, but rather is acquiring property from the LRA as a redeveloper under c. 121B. The LRA will supervise the project for its duration and, under the land disposition agreement with Emerson College, may enforce restrictions contained in the plan. Emerson College receives no tax concessions as a result of its participation in the project because, as a charitable corporation, it is already tax exempt. See G. L. c. 180 (1986 ed.); G. L. c. 59, § 5, Third (1986 ed.). Nothing in c. 121B prohibits otherwise tax-exempt redevelopers from maintaining this status after thus acquiring property in a c. 121B project. Emerson College need not make excise payments in lieu of taxes. The judge correctly ruled that c. 121A, § 18C, does not apply to the project.

9. *Requirements of the Open Meeting Law.*

The plaintiffs claim that the LRA violated the provisions of the open meeting law, G. L. c. 39, §§ 23A-23C. As a remedy, they seek to invalidate the LRA's December 10, 1986, vote determining that the project area is blighted-open. Despite the plaintiffs' claims of numerous violations, only one alleged violation, on December 8, 1986, occurred within the limitation period of § 23B and is therefore properly before us. The Superior Court judge found, and the LRA concedes on appeal, that the LRA violated § 23B at its December 8 meeting. The judge, however, found that the LRA complied with § 23B at its December 10 meeting, and refused to invalidate the determination of blighted-open made at that meeting. The plaintiffs argue that the judge should have invalidated the actions taken on December 10 because of the open meeting violation on December 8.[21] We disagree.

---

[21] The plaintiffs also claim the judge erred in not ordering the LRA to carry out the provisions of the open meeting law at future meetings. See G. L. c. 39, § 23B. There was no error in the judge's decision not to issue such an order, in light of the LRA's subsequent compliance with the statute's requirements. *Benevolent & Protective Order of Elks, Lodge No. 65* v. *City Council of Lawrence, post* 563, 566 (1988).

Section 23B of the open meeting law, G. L. c. 39, §§ 23A-23C, generally prohibits a quorum of a governmental body from meeting "in private for the purpose of deciding on or deliberating toward a decision on any matter." We have noted that "[i]t is essential to a democratic form of government that the public have broad access to the decisions made by its elected officials and to the way in which decisions are reached." *Foudy* v. *Amherst-Pelham Regional School Comm.*, 402 Mass. 179, 184 (1988). The open meeting law's purpose is to provide such access by "eliminat[ing] much of the secrecy surrounding the deliberations and decisions on which public policy is based." *Ghiglione* v. *School Comm. of Southbridge*, 376 Mass. 70, 72 (1978). To accomplish this purpose, the Legislature granted various remedies for violations. In particular, a judge "may invalidate any action taken at any meeting at which any provision of [§ 23B] has been violated." G. L. c. 39, § 23B. Nothing in § 23B empowers a court to invalidate actions taken at a meeting which complies with the requirements of the open meeting law. In order for a court to have authority to nullify an action taken by a public body, the action must be taken while the body was in violation of the statute. See *Puglisi* v. *School Comm. of Whitman*, 11 Mass. App. Ct. 142, 145 (1981). The LRA fully complied with § 23B's provisions at its December 10 meeting. The judge therefore had no power to invalidate this vote. Moreover, the LRA's lengthy public hearings on December 9, and its public deliberations on December 10, helped to accomplish the purpose of the open meeting law. We conclude that the judge properly refused to invalidate the LRA's vote on December 10, 1986.

10. *G. L. c. 12, § 11I.*

Finally, the plaintiffs claim that the judge erred as a matter of law in granting the defendants' motions for summary judgment on the plaintiffs' civil rights claims under G. L. c. 12, § 11I.[22] Under § 11I, which incorporates § 11H, a plaintiff must prove that by threat, intimidation, or coercion a defendant

---

[22] The plaintiffs do not argue on appeal their claims under 42 U.S.C. § 1983 (1982), and we therefore do not address them. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

has interfered with or attempted to interfere with, rights the Constitution or the laws of the Commonwealth secure. G. L. c. 12, §§ 11H, 11I. *Appleton* v. *Hudson*, 397 Mass. 812, 817 (1986). The judge found that the actions of the LRA, the city council, and President Koenig of Emerson College took regarding the proposed taking as a matter of law did not constitute coercion within the meaning of G. L. c. 12, §§ 11H and 11I. We agree.

The plaintiffs' factual allegations concern only the defendants' pursuit of legal rights. The defendants' actions thus lack any element of coercion, threat, or intimidation actionable under § 11I. *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 782 (1987). We reject the plaintiffs' contention that votes by the LRA and the city council approving the proposed taking constitute coercion. We have determined that a "taking [is] an attempted direct, preemptive act and [does] not seek to coerce any plaintiff to do or not to do anything. Legislation, even unlawful legislation, lacks any quality of coercion when that legislation seeks to eliminate the rights of a person and does not seek to force that person unwillingly to do or not to do something otherwise lawful." *Pheasant Ridge, supra* at 781. The votes of the LRA and the city council, therefore, did not interfere with the plaintiffs' rights by coercion. Moreover, the city did not coerce, threaten, or intimidate the plaintiffs within the meaning of §§ 11H and 11I by disclosing, during negotiations to acquire the plaintiffs' property by agreement, its possible intent to take their property by eminent domain. The city had two lawful options open to it: to acquire the property by agreement or to take the property by eminent domain. Its selection of one option over the other does not violate § 11I. There was no error in the judge's grant of summary judgment for the LRA and the city council.

The plaintiffs' claim that President Koenig and Emerson College interfered with their rights by threats, intimidation, and coercion is similarly without merit. The plaintiffs claim that Koenig's requests that the city take the plaintiffs' property by eminent domain, and his statement that Emerson College could not relocate unless a portion of the Elks' property was

taken constitute coercion. We have recognized that, absent extraordinary circumstances, a party may petition "for the redress of grievances" without subjecting himself or herself to liability under G. L. c. 12, § 11I. *Bell* v. *Mazza*, 394 Mass. 176, 183 (1985). Koenig was merely stating his concerns over the proposed plan. There is no indication that either Koenig or any representative of Emerson College attempted to use anything but legal means to relocate Emerson College in Lawrence. The actions of Koenig and Emerson College did not coerce the plaintiffs. The Superior Court judge properly granted summary judgment for Koenig and Emerson College on the plaintiffs' civil rights claim.

*Judgments affirmed.*