462 Mass. 687 (2012)                                    687

Northeast Energy Partners, LLC *v.* Mahar Regional School District; Constellation NewEnergy, Inc.

NORTHEAST ENERGY PARTNERS, LLC *vs.* MAHAR REGIONAL
SCHOOL DISTRICT; CONSTELLATION NEWENERGY, INC.,
third-party defendant.

Suffolk. April 3, 2012. - July 9, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Uniform Procurement Act. Electricity. Words,* "Energy related," "Energy
contract."

This court concluded that a contract between a regional school district and an
energy broker for the procurement of contracts for electricity was an
"energy contract" within the meaning of G. L. c. 30B, § 1 (*b*) (33), and
was thus exempt from the competitive solicitation and bidding procedures
set forth in G. L. c. 30B. [692-700]

CERTIFICATION of questions of law to the Supreme Judicial
Court by the United States District Court for the District of
Massachusetts.

*Kelly T. Gonzalez* for the defendant.

*Scott A. Birnbaum* (*Anne Marie Longobucco* with him) for
the plaintiff.

*Gordon P. Katz & Jessica Ragosta Early,* for Amesbury Hous-
ing Authority & others, amici curiae, submitted a brief.

DUFFLY, J. The Ralph Mahar Regional School District (Ma-
har), which serves several central Massachusetts towns, entered
into a price watch agreement with Northeast Energy Partners,
LLC (Northeast), a licensed broker of energy services based in
Connecticut, pursuant to which Northeast would negotiate and
secure contracts for the provision of Mahar's electricity from
energy suppliers. Mahar did not enter into the agreement to
obtain Northeast's services pursuant to the competitive bidding
procedures contained in G. L. c. 30B. When Mahar questioned
the validity of the agreement, Northeast filed a diversity action
in the United States District Court for the District of Mas-
sachusetts seeking a declaratory judgment that its agreement

with Mahar is valid and enforceable because, under G. L. c. 30B, § 1 (*b*) (33), the agreement is exempt from the competitive solicitation and bidding procedures set forth in G. L. c. 30B. A judge of that court has certified to us the following questions of State law pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):

> "[1.]   Is a contract between a school district and an energy broker for the procurement of contracts for electricity exempt from the requirements of G. L. [c.] 30B as a contract for 'energy or energy related services' pursuant to G. L. c. 30B, § 1 (*b*) (33)?"

> "[2.]   If [G. L. c.] 30B is interpreted to apply to a contract between a school district and an energy broker for the procurement of contracts for electricity, does this interpretation apply retroactively to 2004, to 2008, or only prospectively?"

> "[3.]   If [G. L. c.] 30B applies to the contract, does a provision providing for automatic renewal of the contract term with a public entity, without the public entity's affirmative approval, violate [G. L. c.] 30B?"

For the reasons discussed below, we answer the first certified question, "Yes"; we therefore need not reach the second or third questions.[1]

1. *Background.* We assume the following facts, which we draw from the pleadings and other documents of record. Northeast is a broker of energy services that acts as an agent for clients in purchasing electricity from electricity suppliers. Northeast's clients include businesses and governmental entities, such as regional school districts. Through its "Price Watch Aggregation Program," Northeast negotiates pricing and other terms with electricity suppliers on behalf of a large group of customers; customers sign agreements authorizing Northeast to enter into multiyear, fixed-rate contracts for electricity, up to a

---

[1]We acknowledge the amicus brief of the Amesbury Housing Authority; the cities of Beverly, Brockton, Easthampton, and Newburyport; the towns of Easton, Lexington, Natick, Sharon, Stoneham, and Sudbury; and Bay State Consultants, LLC, in support of the plaintiff.

462 Mass. 687 (2012)                                    689

Northeast Energy Partners, LLC *v.* Mahar Regional School District; Constellation NewEnergy, Inc.

specified maximum rate, on their behalf. Customers do not pay Northeast to participate in the price watch aggregation program. Northeast receives compensation for its services through commissions and other payments from electricity suppliers.

Northeast and Mahar entered into a price watch agreement in July, 2004. That agreement authorized Northeast to explore energy markets, negotiate pricing and other terms, and enter into contracts on Mahar's behalf for the supply of Mahar's electricity requirements for a period of between twelve and forty-eight months, at a price of $0.0669 per kilowatt hour or less. The agreement specified that if Northeast were unable to obtain a contract to supply Mahar's requirements at or below that price, due to "market conditions," Northeast could propose a modification to the agreement to reflect a higher authorized purchase price. The agreement provided also that, on receipt of a proposed higher authorized purchase price or length of term modification, Mahar had fifteen days to respond in writing that it accepted or rejected the proposed modification. If Mahar failed to reject the proposed modification in writing within fifteen days, the agreement would automatically be modified to incorporate the proposed change.[2]

The initial term of the price watch agreement was for one year, ending in July, 2005, but was subject to both extension and automatic renewal under the following circumstances. If Northeast were successful in executing an electricity supply agreement during the one-year period, the initial term would automatically extend to, and be coextensive with, the term of the electricity supply agreement. In addition, as long as Northeast obtained a new or renewal agreement with an electricity sup-

---

[2]The automatic modification provision provides, in relevant part:

"[D]uring the Price Watch Period, [Northeast] may propose, and [Mahar] may agree to increase the Authorized Purchase Price, if warranted by market conditions, and this Agreement will then be modified to reflect the new Authorized Purchase Price as follows. Upon [Mahar's] receipt of the proposed Authorized Purchase Price, [Mahar] shall have fifteen (15) days to respond to [Northeast] and accept the proposed Authorized Purchase Price, or reject same. [Mahar] agrees that if it does not provide a written rejection of the proposed Authorized Purchase Price within the allotted 15-day period, that this Agreement shall be modified to incorporate the Authorized Purchase Price as proposed."

plier, then Mahar's price watch agreement with Northeast would automatically be modified to incorporate the new rate and would renew for a term coextensive with that of the new electricity supply agreement, unless rejected in writing by Mahar within fifteen days.[3]

Northeast was unable to obtain a contract for Mahar at the $0.0669 price authorized by the terms of the initial agreement. In January, 2005, Mahar and Northeast amended the price watch agreement, increasing the authorized purchase price to $0.0792 per kilowatt hour for a term of forty-six months, beginning in March, 2005, and ending in December, 2008. Eileen M. Perkins, who was then Mahar's superintendent, signed the amendment to the price watch agreement to reflect the increased authorized purchase price. In February, 2005, Northeast, as agent for Mahar, entered into an energy service contract with an electricity supplier, Constellation NewEnergy, Inc. (Constellation), pursuant to which Constellation would supply Mahar with electricity at the fixed rate of $0.0792 per kilowatt hour until December, 2008.

In anticipation of the December, 2008, expiration of the electricity supply agreement, Northeast negotiated a new contract with Constellation for electricity supply on Mahar's behalf. In July, 2008, Northeast sent Mahar a proposal for the new contract with Constellation, listing a price of $0.1380 per kilowatt hour for a five-year term commencing in December, 2008, and ending in

---

[3]The automatic renewal provision provides, in relevant part:

> "At any time during the renewal period, [Northeast] may propose to modify the Authorized Purchase Price and/or term that will apply to new or renewal Electric Supply Agreements. Upon [Mahar's] receipt of the proposed Authorized Purchase Price and/or term, [Mahar] shall have fifteen (15) days to respond to [Northeast] and accept the proposed Authorized Purchase Price and/or term, or reject same. [Mahar] agrees that if it does not provide written notice of its intention to reject the proposed Authorized Purchase Price and/or term within the allotted 15-day period, that this Agreement shall be modified to incorporate the Authorized Purchase Price and/or term as proposed."

The agreement provides also that Mahar and Northeast shall each have "the right to cancel the automatic renewal" by providing advance notice "received by the other at least 180 days prior to the expiration of the Contract Period"; however, cancellation is not "effective until all Electric Supply Agreements entered into" by Northeast and Mahar have expired by their terms.

462 Mass. 687 (2012)                                691

Northeast Energy Partners, LLC v. Mahar Regional School District; Constellation NewEnergy, Inc.

December, 2013.[4] Under the provisions of the amended price watch agreement then in effect, Mahar had until August 1, 2008, to decline the proposal.[5] When Mahar did not decline the proposal, Northeast, as agent for Mahar, executed the electricity supply contract with Constellation on August 1, 2008.

In 2009, Mahar's superintendent, Michael Baldassare, became concerned about the rate Mahar was paying for electricity, which he believed was in excess of that being paid in other Massachusetts school districts.[6] His attempts to negotiate a lower rate with Northeast were unsuccessful.

By two letters sent in March and May, 2010, Mahar advised Northeast and Constellation that it believed the price watch agreement to be invalid and unenforceable because the agreement had not been subject to the competitive bidding procedures contained in G. L. c. 30B, and specifically that the automatic renewal provision violated G. L. c. 30B by renewing the agreement without Mahar's "affirmative approval."[7] The letters further advised that Mahar would not be renewing the agreement, that

---

[4]The proposal was contained in a July 15, 2008, letter from Northeast to Raza Namin, who succeeded Eileen M. Perkins as superintendent of Mahar. In its suit in the United States District Court for the District of Massachusetts, Mahar asserts that the mailing had the appearance of an advertisement and failed adequately to notify Mahar of the proposed renewal terms. Namin did not respond to the letter.

[5]Northeast's letter to Mahar states in relevant part:

"We are happy to inform you that we will be triggering the Price Watch Aggregation with Constellation NewEnergy as the chosen supplier. The fixed price will be .1380 per kWh [kilowatt hour] (Proposed Authorized Purchase Price) and will be fixed for 5 years beginning on your scheduled meter read in December 2008. The fixed price will apply to all accounts that you had enrolled into the Price Watch program."

"No action is required on your part to take advantage of this fixed rate. If you choose to decline this offering you must notify us in writing by August 1, 2008."

[6]In its complaint for declaratory judgment, Northeast asserts that "[b]y the end of 2008 . . . market prices for electricity declined due to economic conditions, resulting in Mahar having an agreement to purchase electricity for what turned out to be higher than market rates."

[7]The notification to Northeast was based in part on a letter Mahar received from the Inspector General in response to Mahar's inquiry regarding the validity of its agreement with Northeast; the letter set forth the Inspector General's opinion that the price watch agreement was not exempt from the competitive

Mahar intended to put out to bid "immediately" a contract for electricity services, and that Mahar would seek a declaratory judgment that its contracts with Northeast and Constellation were void.

In July, 2010, Northeast filed the underlying declaratory judgment action in the United States District Court for the District of Massachusetts, and Mahar counterclaimed.[8] In December, 2010, Mahar filed a motion for a preliminary injunction in the Federal case, seeking to enjoin the enforcement of Mahar's contracts with Northeast and Constellation; Northeast and Constellation opposed the motion and filed cross motions for summary judgment on Northeast's claim that the agreements at issue are exempt from the requirements of G. L. c. 30B and therefore valid and enforceable. After a hearing, the judge issued an order certifying the questions now before us.[9]

2. *Discussion.* The first certified question asks that we determine whether an agreement between an energy broker and a regional school district for the procurement of a contract for electricity is a contract for "energy or energy related services" pursuant to G. L. c. 30B, § 1 (*b*) (33), that is exempt from the competitive bidding requirements of G. L. c. 30B. We conclude that it is.

"The starting point of our analysis is the language of the statute, 'the principal source of insight into Legislative purpose.' " *Simon* v. *State Examiners of Electricians*, 395 Mass. 238, 242 (1985), quoting *Commonwealth* v. *Lightfoot*, 391 Mass. 718, 720 (1984). We apply familiar principles of statutory construction, interpreting the Legislature's intent "ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the

bidding requirements of G. L. c. 30B, and that the automatic renewal provision violated G. L. c. 30B, § 12 (*c*) (5).

[8]Mahar asserted affirmative defenses and counterclaimed that the price watch agreement violated G. L. c. 30B and is therefore unenforceable. Mahar also filed a third-party complaint against Constellation, alleging breach of the implied covenant of good faith and fair dealing and violation of G. L. c. 93A, and seeking a declaratory judgment that the energy services contract between Northeast and Constellation violates G. L. c. 30B and is therefore void.

[9]The judge stayed the Federal action pending our response to the certified questions.

462 Mass. 687 (2012) 693

Northeast Energy Partners, LLC *v.* Mahar Regional School District; Constellation NewEnergy, Inc.

mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Harvard Crimson, Inc.* v. *President & Fellows of Harvard College*, 445 Mass. 745, 749 (2006), quoting *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). "Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, prior legislation, [and] contemporary customs and conditions . . . . General expressions may be restrained by relevant circumstances showing a legislative intent that they be narrowed and used in a particular sense." *Simon* v. *State Examiners of Electricians*, *supra* at 243, quoting *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-402 (1931), cert. denied, 284 U.S. 684 (1932).

a. *Uniform procurement act.* General Laws c. 30B, the Uniform Procurement Act (procurement act), is a public bidding statute "designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally." *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Auth.*, 387 Mass. 687, 692 (1982). Unless a specific exemption exists, the procurement act applies "to every contract for the procurement of supplies, services or real property . . . by a governmental body."[10] G. L. c. 30B, § 1 (*a*). As is relevant here, the procurement act does not apply to "energy contracts entered into by a city or town or group of cities or towns or political subdivisions of the [C]ommonwealth, for energy or energy related services." G. L. c. 30B, § 1 (*b*) (33).[11] However, the term "energy related services" is

---

[10]Many of these operative terms are defined in G. L. c. 30B (procurement act). A "contract" includes "all types of agreement for the procurement or disposal of supplies or services, regardless of what the parties may call the agreement"; "[s]upplies" are defined as "all property, other than real property, . . . including services incidental to the delivery, conveyance and installation of such property"; "[s]ervices" are defined as "the furnishing of labor, time, or effort by a contractor, not involving the furnishing of a specific end product other than reports"; and "[g]overnmental body" is defined to include a "regional school district." G. L. c. 30B, § 2.

[11]As do the parties, for purposes of G. L. c. 30B, § 1 (*b*) (33), we treat a regional school district as both a governmental body, G. L. c. 30B, § 2, and a political subdivision of the Commonwealth. See *Boylston Water Dist.* v. *Tahanto Regional Sch. Dist.*, 353 Mass. 81, 82 (1967).

not defined in the procurement act, and the parties advance substantially different definitions in support of their respective positions.

To support its claim that the contract with Northeast is not one for energy related services, Mahar relies on a May 18, 2010, letter from the office of the Inspector General, which is charged with enforcing the public procurement laws. See G. L. c. 12A, § 7. According to that letter, energy related services are limited to those services "that are ancillary to the delivery of energy, such as reactive power and voltage control, loss compensation, and load following."[12] Northeast asserts that, based on the plain meaning of the term "related," its services of "identifying and selecting electricity suppliers, [and] negotiating and executing agreements," are "associated" with or "connected by means of an established or discoverable relation" to the purchase of energy, and are therefore exempt under G. L. c. 30B, § 1 (*b*) (33).

To some extent, focusing on the phrase "energy related services" misses the point. The essential inquiry is whether the agreement at issue is of the type that the Legislature intended to exempt from the public bidding requirements of the procurement act. The exemption does not apply to energy related services as distinct from energy; rather, it applies to "energy contracts . . . for energy or energy related services." G. L. c. 30B, § 1 (*b*) (33). The operative term in this sentence is "energy contracts." Although neither "energy contract" nor "energy related" are terms defined in the procurement act, a precise definition is unnecessary to resolve the question before us;[13] it is apparent from the statutory scheme that the agreement at issue is an energy contract that the

---

[12]The term "[a]ncillary services" is defined by G. L. c. 164, § 1, as "those functions which support generation, transmission, and distribution, and shall include the following services: (1) reactive power or voltage control; (2) loss compensation; (3) scheduling and dispatch; (4) load following; (5) system protection service; and (6) energy imbalance service." This definition closely tracks one proposed by the Federal Energy Regulatory Commission, which described ancillary services under Federal law as "those services necessary to support the transmission of electric power from seller to purchaser." See 60 Fed. Reg. 17,662, 17,683-17,685 (1995).

[13]Department of Public Utilities (department) regulations reference "service . . . attributable to electricity" with respect to the disclosures required of competitive suppliers. See 220 Code Mass. Regs. § 11.06(2)(b)(1)(d)(ii)

462 Mass. 687 (2012)                                    695

Northeast Energy Partners, LLC *v.* Mahar Regional School District; Constellation NewEnergy, Inc.

Legislature intended to exempt from the requirements of the procurement act.

b. *Restructuring act.* In 1997, the Legislature enacted a comprehensive restructuring of the electric utility industry in Massachusetts, see St. 1997, c. 164 (restructuring act), changing it from a government-regulated monopoly to "a framework under which competitive producers will supply electric power and customers will gain the right to choose their electric power supplier."[14] St. 1997, c. 164, § 1 (*c*) (ii). Much of the legislation was codified as amendments to G. L. c. 164, but numerous other provisions of the General Laws were also affected, including sections of the procurement act. See, e.g., St. 1997, c. 164, § 58. Among its declared purposes, the restructuring act was intended to provide affordable electric service "to all consumers on reasonable terms"; to introduce "competition in the electric generation market" in order to "encourage innovation, efficiency, and improved service from all market participants" with resulting "reductions in the cost of regulatory oversight"; to achieve long-term reductions in energy costs by "allowing market forces to play the principal role in determining the suppliers of generation for all customers"; and to preserve and augment "consumer protections, full and fair competition in generation, and enhanced environmental protection goals." St. 1997, c. 164, § 1 (*b*), (*f*), (*k*), (*l*).

The electric utility industry involves three general components:

---

(2008) (where electricity is bundled with any other product or service, competitive suppliers offering generation service "may display the charge [as an] average price . . . assuming the entire price of the bundled service is attributable to electricity").

[14]The restructuring act, "An Act relative to restructuring the electric utility industry in the Commonwealth, regulating the provision of electricity and other services, and promoting enhanced consumer protections therein," added or modified 344 sections of the General Laws. Adoption of the restructuring act followed similar changes in Federal law that created competition within the wholesale electric power industry. See National Consumer Law Center, Access to Utility Service § 1.4.2.4 (1996 & Supp. 1998). The restructuring act reflects considerations underlying the department's earlier investigation: to "promote competition and economic efficiency" in the electric utility industry and to extend to customers "the option of choosing their own electricity suppliers." D.P.U. 95-30 at i, 4 (Aug. 16, 1995) (if "initiatives to restructure the electric utility industry require statutory change, the [d]epartment will coordinate with the Legislature in an effort to bring about change that is in the public interest"). See D.P.U. 95-30 (Feb. 10, 1995).

generation, transmission, and distribution. See *Shea* v. *Boston Edison Co.*, 431 Mass. 251, 253 (2000). Generation is "the act or process of transforming other forms of energy into electric energy or the amount of electric energy so produced." G. L. c. 164, § 1. "Transmission" is the delivery of electric power "from generating facilities across interconnected high voltage lines to where it enters a distribution system." *Id.* From there, electricity is distributed over lower voltage lines to customers.[15] *Id.* See *Shea* v. *Boston Edison Co.*, *supra.*

Prior to the restructuring act, the Massachusetts electric industry consisted of a "complex mosaic of exclusive service territories supported by electricity generation, transmission, and distribution assets under the individual ownership of eight discrete investor-owned utilities" as well as forty municipal utilities. D.P.U. 95-30 at 5 (Feb. 10, 1995). These companies controlled the entire process from the generation of electricity to its final distribution to customers. They owned the electric generation facilities, high-voltage transmission networks, and low-voltage distribution networks used to serve customers in their service territories. *Id.* at 4-6. See *Concord* v. *Boston Edison Co.*, 915 F.2d 17, 19 (1st Cir. 1990), cert. denied, 499 U.S. 931 (1991).

The restructuring act separated these three utility services and opened the supply of generation services to competition, recognizing that "the interests of consumers [could] best be served by an expedient and orderly transition from regulation to competition in the generation sector consisting of the unbundling of prices and services and the functional separation of generation services from transmission and distribution services." St. 1997, c. 164, § 1 (*m*). This functional separation of services, which limited a "company's ability to provide itself an undue advantage in buying or selling services in competitive markets," was regarded as a necessary first step in moving toward "a

---

[15]General Laws c. 164 and the regulations promulgated thereunder, 220 Code Mass. Regs. §§ 11.00, use the term "customer" and "consumer" interchangeably to refer to end users of electricity. See, e.g., G. L. c. 164, §§ 1, 1F; 220 Code Mass. Regs. § 11.02 (2008). A "customer" may also refer to municipalities, which are not necessarily end users. See G. L. c. 164, § 134. For purposes of this decision, we use the terms customer and consumer interchangeably to refer to end users of electricity.

fully competitive generation market based on customer choice." See D.P.U. 95-30 at 16 (Aug. 16, 1995).

In the competitive marketplace, consumers of electricity could choose among different suppliers of electricity services, while still receiving their electricity through the existing transmission and distribution networks. D.P.U. 95-30 at 9-10 (Feb. 10, 1995). Consumers could purchase electricity directly from a distribution company or through a "competitive supplier," an entity licensed by the Department of Public Utilities (department) to purchase wholesale power from generation companies for resale to end users. See 220 Code Mass. Regs. § 11.02 (2008). Consumers could also purchase electricity by utilizing the services of an "electricity broker," an entity that "facilitates or otherwise arranges for the purchase and sale of electricity and related services to [r]etail [c]ustomers, but does [not] sell electricity."[16] *Id.* The restructuring act also directed the department to promulgate rules and regulations that would "provide retail customers with the utmost consumer protections contained in the law" and govern licensing of "all generation companies, aggregators, suppliers, energy marketers, and energy brokers." G. L. c. 164, § 1F, inserted by St. 1997, c. 164, § 193.

A "[s]upplier" of electricity is defined as "a supplier of generation service to retail customers, including power marketers, brokers and marketing affiliates of distribution companies." G. L. c. 164, § 1. That "supplier[s]" are defined to include energy brokers recognizes that suppliers and brokers perform

---

[16]There appears to be a scrivener's error in the definition of "electricity broker" in 220 Code Mass. Regs. § 11.02 ("Electricity broker means an entity . . . that facilitates or otherwise arranges for the purchase and sale of electricity . . . but does sell electricity") in that it omits the word "not" from the clause "but does sell electricity." The word "not" was included in the department's proposed regulations, see D.P.U./D.T.E. 96-100 at A-3 to A-4 (Jan. 16, 1998) (defining "[e]lectricity [b]roker" as entity that "does not produce, purchase, or otherwise take title to" electricity), and in emergency regulations promulgated prior to the notice and comment period. See D.P.U./ D.T.E. 96-100 at A-1 (Jan. 9, 1998). In its order promulgating the final regulations, which omits the word "not," the department distinguished between suppliers and brokers as "entities that sell electricity and those that merely facilitate the sale." See D.P.U./D.T.E. 96-100 at 7 (Feb. 20, 1998). An electronic version, available through the department's Web site, contains the word "not." It is apparent from this history, as well as a plain reading of the regulation, that an electricity broker is an entity that "does not sell electricity."

698       462 Mass. 687 (2012)

Northeast Energy Partners, LLC v. Mahar Regional School District; Constellation NewEnergy, Inc.

functionally equivalent services that enable consumers to select and purchase electricity from an array of competitive sources. In directing the department to promulgate licensing regulations for the restructured industry, the Legislature also included brokers as a type of supplier. See G. L. c. 164, § 1F (1) (requiring department to license "all generation companies, aggregators, suppliers, energy marketers, and energy brokers," and referring to "energy brokers, energy marketers, and other suppliers"). It is apparent from the inclusion of energy brokers within the statutory scheme that the Legislature envisioned that such brokers, by facilitating the sale and purchase of electric energy from the suppliers of energy, would play an important role in "accommodat[ing] retail access to generation services and choice of suppliers by retail customers." G. L. c. 164, § 1F.

Although the department's regulations distinguish between competitive suppliers and electricity brokers, in that a broker does not own or sell electricity to a consumer and only "facilitates or otherwise arranges" for its purchase and sale, 220 Code Mass. Regs. § 11.02, a broker is treated as equivalent to a supplier in the broader regulatory scheme.[17] Consistent with the statutory language, brokers are explicitly enumerated in various regulatory definitions of "supplier." See 220 Code Mass. Regs. § 12.02 (2008) (defining "[n]on-affiliated [e]nergy [s]upplier" as any entity "engaged in marketing, brokering, or selling natural gas, electricity, or energy-related services to retail customers where such product or service is also provided by a Competitive Energy Affiliate"); 940 Code Mass. Regs. § 19.03 (1998) ("[r]etail [s]eller of [e]lectricity" is "any business, person or entity selling, offering to sell, arranging for the sale of, or engaged to market electricity or related products or services to

---

[17]In its order promulgating the regulations, the department notes that the restructuring act defines "supplier" to include entities such as brokers. D.P.U./D.T.E. 96-100 at 6 (Feb. 20, 1998). The department determined, however, that for purposes of documentation and disclosure, a distinction was needed between entities selling electricity and those that merely facilitate the sale. The department "requires somewhat different documentation from competitive suppliers than from electricity brokers"; "[t]he duty to disclose certain information resides with a competitive supplier, not with an electricity broker." Id. at 7. See, e.g., 220 Code Mass. Regs. § 11.05(2)(b)(14) (2009) (documentation regarding supplier participation with New England Power Pool); 220 Code Mass. Regs. § 11.06 (2008) (disclosures, including price of generation services).

462 Mass. 687 (2012)                                        699

Northeast Energy Partners, LLC *v.* Mahar Regional School District; Constellation NewEnergy, Inc.

consumers, including . . . to all entities which are regulated, or which are required to be licensed, by the [d]epartment for these purposes"). Suppliers and brokers are generally subject to the same requirements. See, e.g., 220 Code Mass. Regs. § 11.05 (2009) (establishing "requirements applicable to all Competitive Suppliers and Electricity Brokers").

c. *Application to the first certified question.* At the same time that the Legislature created this newly competitive energy marketplace, it also exempted from the procurement act's complex public bidding requirements "energy contracts entered into by . . . political subdivisions of the commonwealth, for energy or energy related services." G. L. c. 30B, § 1 (*b*) (33). There is no dispute that a contract for the purchase and sale of electricity entered into directly between a regional school district and an energy supplier is an "energy contract" within the meaning of the exemption. Because a broker that facilitates or arranges for the purchase and sale of electricity on behalf of a retail customer performs functionally the same service as an energy supplier, the Legislature could not have intended to require that such contracts with energy brokers be subject to the procurement act, while exempting agreements for the direct purchase of energy from energy suppliers.

In addition to including brokers within the statutory definition of suppliers, the Legislature required the licensing and regulation of both types of entities. See G. L. c. 164, § 1F. The regulations preclude competitive suppliers from using the services of "any entity to facilitate or otherwise arrange for the purchase and sale of electricity to [r]etail [c]ustomers, unless such entity has been licensed as an [e]lectricity [b]roker by the [d]epartment." 220 Code Mass Regs. § 11.05(5). Furthermore, the Legislature established consumer protections for end users, including regional school districts, in the form of licensing requirements and customer authorization requirements applicable to both suppliers and brokers. See G. L. c. 164, § 1F (1), (8) (*a*); 220 Code Mass. Regs. § 11.05(2), (4). The Legislature also put in place a mechanism for oversight of energy contracts entered into by cities, towns, and political subdivisions. A contract exempt from the procurement act pursuant to G. L. c. 30B, § 1 (*b*) (33), must nevertheless be submitted to the department, the Department of

Energy Resources, and the office of the Inspector General within fifteen days of signing, along with "a report of the process used to execute the contract."

These licensing and regulatory provisions guard against potential abuses in the new competitive environment, and support a determination that the Legislature intended to exempt from the requirements of the procurement act a contract for energy between a regional school district and an electricity broker, as well as between a regional school district and a competitive supplier of electricity. We therefore conclude that an agreement between a regional school district and an energy broker to arrange for the purchase of electricity is an "energy contract" exempt from the requirements of the procurement act pursuant to G. L. c. 30B, § 1 (*b*) (33).

3. *Conclusion.* We answer the first certified question, "Yes." Because of our answer to the first certified question, the second and third certified questions are not applicable, and we do not answer them.

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court. The clerk will transmit one copy, under the seal of the court, to the clerk of the United States District Court for the District of Massachusetts, as the answer to the questions certified, and will also transmit a copy to each party.