KAFKER, J.
**149 In 2000, before the Boston Red Sox's recent run of World Series championships, the viability of Fenway Park and the surrounding area as the long-term home of the team was a **150 source of great concern to city planners, State legislators, the park's neighbors, and, of course, die-hard Red Sox fans. In August 2000, the Legislature declared the area surrounding Fenway Park to be a blighted area and authorized the construction of a new ballpark. Following fierce neighborhood opposition and a change in the Red Sox's ownership, however, plans were made to try to improve the existing Fenway Park and its environs.
One such fix concerned the park's concourse area, which, at the time of the contemplated upgrades, was notoriously limited, and indeed was considered the smallest of any ballpark in Major League Baseball. To facilitate improvements to this area of Fenway Park, in 2003, the Boston Redevelopment Authority (BRA)[1] exercised its eminent domain powers as an *1225 urban renewal agency pursuant to the demonstrations clause of the urban renewal statute, G. L. c. 121B, § 46 (f ), and executed a temporary ten-year taking of a limited easement over a portion of Yawkey Way[2] -- a public way adjacent to Fenway Park. The BRA then entered into a licensing agreement with the Red Sox, which granted the Red Sox exclusive use and control over Yawkey Way on all days that the Red Sox played a game at Fenway Park (home games) for a period of ten years.
In 2013, with this temporary taking set to lapse and the licensing agreement about to expire, the BRA executed a permanent taking of the Yawkey Way easement -- again pursuant to § 46 (f ) -- and subsequently sold the easement rights directly to the Red Sox for as long as Major League Baseball games are played at Fenway Park.
The plaintiff, a local attorney and business owner who had sought to acquire the Yawkey Way easement rights for himself, commenced a civil action in the nature of certiorari in the Superior Court, challenging the legality of the BRA's actions with respect to the Yawkey Way easement. In his complaint, he argued that the BRA exceeded the scope of its authority when it executed a permanent taking of the Yawkey Way easement pursuant to § 46 (f ) because the area was no longer blighted. He also argued that the BRA's actions caused him harm because he **151 should have been allowed to bid on the Yawkey Way easement rights pursuant to the Uniform Procurement Act, G. L. c. 30B (procurement act). The parties filed cross motions for judgment on the pleadings, and the motion judge granted judgment for the BRA. The plaintiff now appeals, raising the same arguments that he made below, and we transferred the case to this court on our own motion.
Because we conclude that the plaintiff lacks standing to challenge the permanent taking of the Yawkey Way easement and the sale of the easement rights pursuant to G. L. c. 121B, § 46 (f ), we affirm.[3] ,[4]
Background. 1. The BRA and its authority. The BRA is an urban renewal agency. Mahajan v. Dep't of Envtl. Protection, 464 Mass. 604, 606, 984 N.E.2d 821 (2013). In this capacity, the BRA is vested with the authority under G. L. c. 121B to "effectuate the goals of urban renewal," ibr.US_Case_Law.Schema.Case_Body:v1">id., which include the elimination of "decadent, substandard or blighted" areas and the promotion of the "sound growth of the community." G. L. c. 121B, § 45. To that end, the BRA guides "private sector development toward areas in need" through *1226 various means, including "land assembly, title confirmation, public financial assistance, and development and design controls." Mahajan, supra. See G. L. c. 121B, §§ 46 - 57A. The BRA is also tasked with "supervis[ing] the adoption and administration of urban renewal plans" -- detailed plans for urban renewal projects that are created for the purpose of redeveloping substandard, decadent, or blighted areas in Boston.[5] **152 St. Botolph Citizens Comm., Inc. v. Boston Redev. Auth., 429 Mass. 1, 3, 705 N.E.2d 617 (1999) ( St. Botolph ). See G. L. c. 121B, § 1 (defining urban renewal projects and urban renewal plans).
Perhaps the most "significant power granted to the BRA" to carry out the goals of urban renewal, however, is the power of eminent domain. Mahajan, 464 Mass. at 606, 984 N.E.2d 821. Section 11 grants the BRA the broad authority to "take by eminent domain ... any property, real or personal, or any interest therein, found by it to be necessary or reasonably required to carry out the purposes of [G. L. c. 121B], or any of its sections." G. L. c. 121B, § 11 (d ). One such section under G. L. c. 121B is § 46 (f ), which expressly authorizes the BRA to "develop, test and report methods and techniques and carry out demonstrations for the prevention and elimination of slums and urban blight."
It is the BRA's exercise of the eminent domain power pursuant to this section that gave rise to the issues presented in this case.
2. Factual background. We summarize the material facts, which are not disputed.[6] Plans to replace Fenway Park with a new ballpark were under serious consideration as recently as the early 2000s. Indeed, in 2000, the Legislature enacted St. 2000, c. 208, entitled "An Act relative to the construction and financing of infrastructure and other improvements in the city of Boston and around Fenway Park," which included explicit findings that, as it existed at the time, Fenway Park was "inadequate for the purposes for which it was designed and a new ballpark is required to attract and retain those athletic events which shall promote the economic health of the commonwealth and encourage further private development." St. 2000, c. 208, § 1 (d ). The Legislature declared the area surrounding Fenway Park to be an "economic development area," which is defined under St. 1971, c. 1097, **153 § 1 (e ), to be "any blighted open area or any decadent area" as those terms are defined by G. L. c. 121B, § 1.[7] *1227 St. 2000, c. 208, § 4 (a ). A new ballpark, the Legislature found, would "significantly enhance the economic development and the general welfare of the commonwealth." St. 2000, c. 208, § 1 (a ).
Support for a new ballpark, however, was not universal. Local activists and organizations such as "Save Fenway Park" advocated for the preservation and redevelopment of the existing park, rather than the construction of a new one. Then, in 2002, a new ownership group purchased the Red Sox and the focus thereafter shifted from developing a new ballpark to reconfiguring and improving Fenway Park.
To that end, the Red Sox sought approval from the BRA to undertake a series of improvements to the park, including a modification to its seating structure and upgrades to its concourse area. In 2003, the BRA voted to designate the Red Sox's improvement proposal as a "demonstration project plan" under the demonstrations clause of G. L. c. 121B, § 46 (f ), which authorizes the BRA to "develop, test and report methods and techniques and carry out demonstrations for the prevention and elimination of slums and urban blight." As part of the plan, the BRA declared that "in order to protect against urban blight, the ... acquisition and transfer of adjacent areas to the existing Fenway Park are in the best interest of both the [BRA] and the City of Boston." The plan was approved and adopted by the BRA as a "demonstration project."[8]
To carry out the plan, the BRA, among other actions, executed a taking of certain surface easement rights over Yawkey Way for a period of ten years by using its eminent domain power under **154 G. L. c. 121B, § 11 (2003 taking). These rights, however, were limited. The relevant portion of Yawkey Way is owned to the center line by three abutters: the Red Sox, Twins Realty Trust, and Twins Enterprise, Inc.[9] The city of Boston (city), however, held a surface easement over Yawkey Way that allowed it to operate Yawkey Way as a public way. Accordingly, any proposed use of Yawkey Way beyond its operation as a public way would require the consent of the owners of the fee -- including the Red Sox.
When the BRA executed the 2003 taking of the Yawkey Way easement rights, its taking was limited to the rights held by the city -- specifically, the ability to operate Yawkey Way as a public way so that members of the public could traverse the street. The BRA then entered into a ten-year licensing agreement with the Red Sox, which provided, in pertinent part, that the Red Sox would be permitted to close Yawkey Way to the public for a certain period of time both before and after Red Sox home games in order to utilize the area as an extension of Fenway Park's concourse.[10]
*1228 Nearly a decade later, in late 2012, with the temporary taking of the Yawkey Way easement set to lapse and the licensing agreement between the BRA and the Red Sox set to expire, the Inspector General sent a letter to the director of the BRA stating that it was the opinion of his office that the licensing agreement between the BRA and the Red Sox could not be "renegotiated, extended or renewed under existing state law absent a new taking." The Inspector General further opined that before any new taking could occur, the BRA would have to "declare Yawkey Way a blighted area." The Inspector General warned, however, that such a declaration "may expose the BRA to a legal challenge ... given the capital improvements made to the area during the demonstration period and the record of higher than expected revenues during game days." Finally, the Inspector General informed the BRA that to fulfill its obligation to ensure that it receives the fair value from the licensing of Yawkey Way, it should either "follow procurement practices set in [G. L. c. 30B], or seek special legislation."[11]
**155 At around this same time, the plaintiff in this case, a local attorney and business owner, reached out to the BRA on several occasions to express his interest in acquiring the rights to the Yawkey Way easement once the BRA's licensing agreement with the Red Sox expired. The plaintiff proposed entering into his own ten-year licensing agreement with the BRA in exchange for approximately $3 million. The plaintiff explained that it was his intention to lease spaces on Yawkey Way to vendors "promoting the Boston experience." In his correspondence, the plaintiff suggested that the BRA "follow the guidance and suggestions of the Inspector General, and put the [licensure of the Yawkey Way easement] 'out to bid' in order to allow others to participate in a transparent, fair and competitive bid procedure." Doing so, he argued, would ensure that he could "have an opportunity to 'make a living' and not to be deprived [of] the same."
The BRA declined to solicit bids. Instead, in September 2013, the BRA sought to "ratify and confirm its adoption of a Demonstration Project Plan pursuant to [ § 46 (f ),] ... which was originally adopted on December 5, 2002."
The plan, as revised in 2013, proposed a permanent order of taking of the Yawkey Way easement, as well as the direct sale of the easement rights to the Red Sox for approximately $4.8 million. The BRA declared in its proposed order of taking that these actions were necessary for "the prevention of urban blight" to the area surrounding Fenway Park.
On the same day that the proposed plan was presented to the BRA's board, the plan was approved. The BRA thereafter executed the permanent taking of the Yawkey Way easement (2013 taking) and entered into an agreement with the Red Sox to convey the Yawkey Way easement rights for as long as Major League Baseball games are played at Fenway Park, in exchange for $4.8 million. As before, the agreement permitted the Red Sox to close part of Yawkey Way on game days for a certain period of time both before and after the games. The agreement also permitted the Red Sox to engage and employ third parties to provide services on Yawkey *1229 Way on game days as part of Fenway Park's extended concourse.
The plaintiff thereafter timely sought review of the BRA actions **156 pursuant to G. L. c. 121B, § 47. The parties filed cross motions for judgment on the pleadings, and the motion judge granted judgment for the BRA, concluding that the plaintiff lacked standing to challenge the 2013 taking. The court further concluded that even if the plaintiff had standing, the 2013 taking was a valid exercise of the BRA's authority under § 46 (f ). The plaintiff now appeals, and we affirm because the plaintiff lacks standing.
Discussion. We review the allowance of a motion for judgment on the pleadings under Mass. R. Civ. P. 12 (c), as appearing in 470 Mass. 1501 (2015), de novo. Perullo v. Advisory Comm. on Personnel Standards, 476 Mass. 829, 834, 72 N.E.3d 1048 (2017). "For the purposes of a rule 12 (c) motion, all of the well-pleaded factual allegations of the nonmoving party are assumed to be true." Champa v. Weston Pub. Sch., 473 Mass. 86, 90, 39 N.E.3d 435 (2015). When a defendant challenges a plaintiff's standing in a motion for judgment on the pleadings, we likewise "accept the factual allegations in the plaintiff['s] complaint, as well as any favorable inferences reasonably drawn from them, as true." Ginther v. Commissioner of Ins., 427 Mass. 319, 322, 693 N.E.2d 153 (1998).
The plaintiff argues that the BRA exceeded the scope of its authority when it executed a permanent taking of the easement pursuant to G. L. c. 121B, § 46 (f ). Specifically, he argues that § 46 (f ) could not serve as the underlying basis for the 2013 taking because there was no evidence that the taking would "prevent[ ] and eliminat[e]" urban blight, which he argues is a necessary precondition to any exercise of the BRA's eminent domain powers under § 46 (f ). He also claims he was injured by the 2013 taking and subsequent sale of the Yawkey Way easement because the easement rights would have otherwise been subject to public bidding requirements pursuant to the procurement act, G. L. c. 30B. We conclude that the plaintiff lacks standing in this case, as there was no public duty owed to him to put the easement out to bid and his alleged injury is entirely speculative.
The question of legal standing is a jurisdictional matter. Phone Recovery Servs., LLC v. Verizon of New England, Inc., 480 Mass. 224, 227, 102 N.E.3d 968 (2018). Where a plaintiff lacks standing to bring an action, the court lacks jurisdiction of the subject matter and must therefore dismiss the case. Rental Prop. Mgt. Servs. v. Hatcher, 479 Mass. 542, 546-547, 97 N.E.3d 319 (2018).
To establish standing to challenge the actions of an administrative agency or official, a plaintiff must allege "an injury within the area of concern of the statute or regulatory scheme under **157 which the injurious action has occurred" (citation omitted). Indeck Me. Energy, LLC v. Commissioner of Energy Resources, 454 Mass. 511, 517, 911 N.E.2d 149 (2009). That is, to have standing in this case, the plaintiff's interests "must come within the zone of interests arguably protected" by either G. L. c. 121B or G. L. c. 30B (quotations and citation omitted). Id. An injury alone, however, is "not enough; a plaintiff must allege a breach of duty owed to it by the public defendant" (citation omitted). Benevolent & Protective Order of Elks, Lodge No. 65 v. Planning Bd. of Lawrence, 403 Mass. 531, 545, 531 N.E.2d 1233 (1988) ( Elks Lodge ). In the absence of such a showing, a party does not have standing to challenge an agency decision.
In order to determine whether the plaintiff suffered an injury or was owed a duty *1230 in this case, we consider the nature of the property interest taken by the BRA; the plaintiff's legal relationship, if any, to that property interest; and the harm he claims to have suffered as a result of the 2013 taking.
The plaintiff did not own the Yawkey Way easement; the city did. Compare Elks Lodge, 403 Mass. at 546, 531 N.E.2d 1233 (standing where BRA's approval of urban renewal plan involved taking of plaintiff's property because "private rights most clearly affected by" use of eminent domain powers are "those of owners and tenants of land in the project area," as decision that "property is blighted-open has direct impact on rights in that property" [citation omitted] ). He was also not an adjoining property owner whose property rights would be affected by the Yawkey Way easement. See Boston v. A.W. Perry, Inc., 304 Mass. 18, 20, 22 N.E.2d 627 (1939) ("It has always been held with respect to land included within the limits of the public way to be clear that the public have no other right, but that of passing and repassing; and that the title to the land, and all the profits to be derived from it, consistently with, and subject to, the right of way, remain in the owner of the soil" [quotation and citation omitted] ); Opinion of the Justices, 297 Mass. 559, 562, 8 N.E.2d 179 (1937) ("Abutting owners ordinarily hold the title to the fee to the center of the public way, subject only to the easement of travellers to pass and repass.... Whatever is done within the limits of the highway by the public or by members of it not justifiable as incidental to travel is a violation of the rights of the abutting owner"). Nor did the plaintiff have a previously entrenched business on Yawkey Way such that the 2013 taking would cause a substantial loss to a preexisting business. Compare **158 Boston Edison Co. v. Boston Redev. Auth., 374 Mass. 37, 43-44, 371 N.E.2d 728 (1977) (party considered "aggrieved" under separate statute where BRA's approval of project would cause plaintiff to lose $3 million over several decades). In those circumstances, the injuries stemming from the actions of the BRA pursuant to § 46 (f ) would have been direct and ascertainable, and thus would have been sufficient to confer standing.[12] See Elks Lodge, supra. See also Boston Edison Co., supra at 44, 371 N.E.2d 728.
For the purposes of establishing a legal right or duty owed to him that was infringed upon by the 2013 taking, the plaintiff turns to public bidding law, particularly G. L. c. 30B, the procurement act. He claims that he had a right to bid on the Yawkey Way easement when it was taken and sold to the Red Sox pursuant to G. L. c. 121B, § 46 (f ). We disagree. For the reasons explained infra, if the 2013 taking was a proper exercise of the BRA's authority under § 46 (f ), the subsequent sale of the easement rights to the Red Sox was exempt from the public bidding law requirements of the procurement act. If, on the other hand, the Yawkey Way easement was improperly taken by the BRA under § 46 (f ), the easement would have reverted to the city, which would have been under no legal obligation to put the easement out to bid. Under either scenario, there was no obligation by either the BRA or the city to subject the Yawkey Way easement to public bidding.
The procurement act is "designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally"
*1231 (citation omitted). Northeast Energy Partners, LLC v. Mahar Regional Sch. Dist., 462 Mass. 687, 693, 971 N.E.2d 258 (2012). In the absence of a specific exemption, the procurement act applies "to every contract for the procurement of supplies, services or real property ... by a governmental body." G. L. c. 30B, § 1 (a ). In the case of the acquisition or disposition of "real property or any interest therein," G. L. c. 30B, § 16, requires contracts in excess of $35,000 to be awarded on the basis of advertised, competitive bidding.
As relevant here, however, the procurement act expressly exempts contracts "to sell[,] lease or acquire ... real property by a[n] ... urban renewal agency engaged in the development and disposition of said real property in accordance with a plan approved by the appropriate authorizing authority."
**159 G. L. c. 30B, § 1 (b ) (25). The parties do not dispute that the BRA is an urban renewal agency under § 1 (b ) (25). See G. L. c. 121B, §§ 1, 4, 9. Nor can it be disputed that, in the context of G. L. c. 121B, § 46 (f ), the BRA is an "appropriate authorizing authority." G. L. c. 121B, § 46 (f ) (urban renewal agencies specifically authorized to "carry out demonstrations for the prevention and elimination of slums and urban blight"). The parties instead contest the legal issue whether the demonstration project plan that was approved and implemented by the BRA in 2013 is properly considered a "plan" under the G. L. c. 30B, § 1 (b ) (25), exemption. The plaintiff argues that this exemption applies only to "urban renewal plans" described in G. L. c. 121B, § 1. See note 5, supra (describing specific requirements of urban renewal plans).
When interpreting a statute, our primary duty is to "effectuate the intent of the Legislature in enacting it" (citation omitted). Matter of E.C., 479 Mass. 113, 118, 92 N.E.3d 724 (2018). The "primary source of insight into the intent of the Legislature is the language of the statute." Commissioner of Correction v. Superior Court Dep't of the Trial Court for the County of Worcester, 446 Mass. 123, 124, 842 N.E.2d 926 (2006). Where, as here, the language of the statute is "plain and unambiguous, it is conclusive as to legislative intent." Meyer v. Veolia Energy N. Am., 482 Mass. 208, 211-212, 121 N.E.3d 1221 (2019). Section 1 (b ) (25) expressly exempts from the public bidding requirement those dispositions of real property that are made "in accordance with a plan" (emphasis added). The exemption does not, as the plaintiff argues, refer only to those made in accordance with an "urban renewal plan" as described in G. L. c. 121B, §§ 1, 48. Although the procurement act does not define the word "plan," we conclude that the Legislature did not intend to limit the scope of the exemption to urban renewal plans alone.
The urban renewal statutory scheme was enacted in 1969 and included numerous provisions that either made reference to, or dealt exclusively with, "urban renewal plans." See, e.g., St. 1969, c. 751, §§ 1, 46-49. Indeed, the term itself is specifically defined by statute. G. L. c. 121B, § 1. Nearly two decades later, in 1989, the procurement act was enacted. St. 1989, c. 687, § 3. Shortly thereafter, the procurement act was amended to include the § 1 (b ) (25) exemption. St. 1991, c. 138, § 112. Despite the Legislature's familiarity with the urban renewal statute, and the importance and existence of urban renewal plans, it did not see fit to modify or limit the exemption under § 1 (b ) (25) to urban renewal plans alone. Id. See **160 Commonwealth v. George W. Prescott Publ. Co., 463 Mass. 258, 266, 973 N.E.2d 667 (2012) ("We presume that the Legislature is familiar with existing laws when enacting a new statute ..."). Rather, it chose to include *1232 any plan of an urban renewal agency that is approved within the scope of the exemption. St. 1991, c. 138, § 112. We therefore conclude that although it is clear that the Legislature intended for urban renewal plans to be included within the exemption, see St. Botolph, 429 Mass. at 13, 705 N.E.2d 617, it is equally clear that the Legislature did not intend to limit the exemption to only those plans. Limiting the scope of the exemption to urban renewal plans only -- as the plaintiff would have us do -- would thus contravene the Legislature's intent. It would also require us to rewrite the statute. We decline to do so. See Commonwealth v. McLeod, 437 Mass. 286, 294, 771 N.E.2d 142 (2002) ("We will not add words to a statute that the Legislature did not put there, either by inadvertent omission or by design").
In the instant case, the Yawkey Way easement was taken by the BRA, an urban renewal agency, pursuant to an approved demonstration project plan under § 46 (f ). The express terms of the exemption under G. L. c. 30B, § 1 (b ) (25), were therefore satisfied. Accordingly, given that the Yawkey Way easement was properly taken pursuant to a § 46 (f ) demonstration project plan, its subsequent sale to the Red Sox was exempt from public bidding.
We recognize that the plaintiff also contends that the § 46 (f ) process was abused in this case. Specifically, he claims that the property at issue was not blighted and that § 46 (f ) therefore cannot apply. We fail to see, however, how that provides him standing in this case. Even if, as the plaintiff alleges, the § 46 (f ) process was misused by the BRA because the area surrounding Fenway Park was no longer blighted, this would not have meant that the Yawkey Way easement would have been required to be put out to bid, or that the plaintiff would have been entitled to operate concessions on Yawkey Way. Absent the BRA's 2013 taking, the rights to the Yawkey Way easement simply would have reverted back to the city, which was, of course, free to retain the easement. The city was under no obligation to subsequently put the easement out to bid, and any argument to the effect that the city would have sought to sell the easement is entirely speculative.[13]
**161 Finally, even if the Yawkey Way easement had reverted to the city, the city had decided to sell the easement, and the plaintiff had won the bid, there is no allegation that the plaintiff would have had the right to operate concessions on the property and thus has been injured by the loss of such revenue. As explained supra, the Yawkey Way easement rights that the BRA took *1233 only concerned the ability to operate Yawkey Way as a public way. Acquisition of those rights alone did not provide the plaintiff a right to operate concessions on the property. Had the plaintiff somehow acquired the Yawkey Way easement rights from the city, he would still have been required to obtain the cooperation and consent of the Red Sox and other adjoining parties who were the fee owners of Yawkey Way. Without their consent, the plaintiff could only enforce the roadway easement, not operate concessions. See A.W. Perry, Inc., 304 Mass. at 20, 22 N.E.2d 627 ; Opinion of the Justices, 297 Mass. at 562, 8 N.E.2d 179. There is no allegation that such consent was expected or would be forthcoming. Indeed, the pleadings indicate exactly the opposite.
In sum, the plaintiff in this case was merely a private party with neither a property interest nor an existing business that would be adversely affected by the 2013 taking. He also had no right to bid on the Yawkey Way easement after it was taken by the BRA and sold pursuant to a proper § 46 (f ) process, and even if the process were somehow flawed, the easement would revert to the city, which had no obligation to sell it. He was thus owed no duty by either the BRA or the city. Elks Lodge, 403 Mass. at 545, 531 N.E.2d 1233 ("a plaintiff must allege a breach of duty owed to it by the public defendant" to have standing). Moreover, even if the city had **162 decided to sell the Yawkey Way easement and put it out to bid, and even if the plaintiff won the bid, the plaintiff could not have used it to sell concessions without the consent of the Red Sox and the other adjoining fee owners -- and indeed, there is no allegation that such consent would have been provided. Without the ability to operate concessions, there could be no economic injury to the plaintiff. For all these reasons, the plaintiff was owed no legal duty by a public defendant, and his claim of injury is entirely "speculative, remote, and indirect" (citation omitted). Arbella Mut. Ins. Co. v. Commissioner of Ins., 456 Mass. 66, 82, 921 N.E.2d 537 (2010). See Ginther, 427 Mass. at 323, 693 N.E.2d 153 ("the complained of injury must be a direct consequence of the complained of action"). He therefore lacks standing to challenge the 2013 taking.[14] *1234 Conclusion. Because the plaintiff lacks standing to challenge **163 the BRA's actions in this case, we affirm the motion judge's allowance of the BRA's motion for judgment on the pleadings, as well as the denial of the plaintiff's motion for leave to amend his complaint.
So ordered.

The Boston Redevelopment Authority (BRA) was renamed the Boston Planning and Development Agency in September 2016. We refer to the former name in this opinion, as that was the name used at all relevant times.

Yawkey Way was renamed Jersey Street in May 2018. Because it was named Yawkey Way at all times relevant to this case, however, we refer to it as such throughout this opinion.

We acknowledge the amicus briefs submitted in support of the BRA by the Boston Red Sox Baseball Club Limited Partnership and Olde Town Team Realty Trust, and by NAIOP Massachusetts.

The plaintiff also appeals from the denial of his motion to file an amended complaint. The amended complaint sought to add new claims for judicial review of the BRA's transfer of easement rights to the Boston Red Sox, for monetary damages arising from the BRA's permanent taking of the Yawkey Way easement in 2013 (2013 taking), and for a violation of G. L. c. 93A. We discern no abuse of discretion. Dzung Duy Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 461, 96 N.E.3d 128 (2018) ("We review the denial of a motion to amend the complaint for abuse of discretion"). For the reasons set forth in the motion judge's decision denying the motion to amend, and for the reasons discussed infra, the plaintiff's proposed claims are futile. See id. (judge does not abuse his or her discretion in denying motion to amend complaint where proposed claims "would be futile").

Urban renewal plans, and the projects undertaken pursuant to such plans, are strictly defined under G. L. c. 121B, and their approval is contingent on the BRA's ability to meet several preconditions. For instance, a project may not be carried out until a public hearing relating to the project's plan has been held and the plan has been approved by "the city council of a city or the municipal officers of a town." G. L. c. 121B, § 48. Additionally, an urban renewal plan cannot be approved until the Department of Housing and Community Development makes several findings, including explicit findings that "the proposed land uses and building requirements in the project area will afford maximum opportunity to privately financed urban renewal consistent with the sound needs of the locality as a whole"; "the financial plan is sound"; "the project area is a decadent, substandard or blighted open area"; and "that the urban renewal plan is sufficiently complete." Id. See G. L. c. 121B, § 1.

The facts stated here are taken primarily from the motion judge's decision on the parties' cross motions for judgment on the pleadings.

General Laws c. 121B, § 1, defines "blighted open area," in pertinent part, as "a predominantly open area which is detrimental to the safety, health, morals, welfare or sound growth of a community because it is unduly costly to develop it soundly through the ordinary operations of private enterprise." Similarly, § 1 defines "decadent area" as "an area which is detrimental to safety, health, morals, welfare or sound growth of a community because of the existence of buildings which are out of repair, physically deteriorated, unfit for human habitation, or obsolete, or in need of major maintenance or repair."

The record does not reveal how often the BRA exercises its eminent domain power pursuant to G. L. c. 121B, § 46 (f ). We are aware, however, that it has previously done so on multiple occasions. See Tremont on the Common Condominium Trust vs. Boston Redev. Auth., Mass. Super. Ct., No. 01-2705 (Suffolk County Sept. 23, 2002) (Botsford, J.) (eminent domain powers used pursuant to § 46 [f ] to take road next to historic Opera House to allow its expansion).

The Red Sox have an agreement with the abutters as to the game day uses of Yawkey Way.

In return, the Red Sox agreed to pay the BRA $165,000 per year, subject to an annual percentage adjustment as defined by the licensing agreement.

The Uniform Procurement Act applies "to every contract for the procurement of supplies, services or real property ... by a governmental body." G. L. c. 30B, § 1 (a ). That act expressly exempts, however, contracts "to sell[,] lease or acquire ... real property by a[n] ... urban renewal agency engaged in the development and disposition of said real property in accordance with a plan approved by the appropriate authorizing authority." G. L. c. 30B, § 1 (b ) (25).

Of course, these illustrations are only two examples of would-be plaintiffs who could have standing to challenge a taking pursuant to G. L. c. 121B, § 46 (f ). There may be other types of injury that would give rise to standing.

We note that the Legislature had previously determined in 2000 that the area surrounding Fenway Park was a blighted area, and that deference is due to the BRA's subsequent determination that the 2013 taking was necessary to "prevent" this blight from reoccurring. Nevertheless, we need not decide whether the facts alleged regarding the absence of blight are sufficient to survive a motion under Mass. R. Civ. P. 12 (c), because, as explained supra, the plaintiff lacks standing to challenge the 2013 taking even if the § 46 (f ) process was flawed.
We further note, however, that the BRA's actions in this case were met with substantial criticism. For example, in 2015, the Inspector General issued a report that concluded that the BRA "did not exercise the due diligence it owes to the City and the taxpayers" by failing to ensure that the sale price for the Yawkey Way easement rights was the fair market value. Moreover, the Inspector General criticized the procedure used to approve the demonstration project plan under § 46 (f ), noting that the "BRA staff gave the BRA Board insufficient information and only six hours to review the proposed transactions, and the BRA Board may not have met its duty to exercise informed judgment." We express no opinion on whether the sale itself was at market value, or whether the § 46 (f ) process was improperly rushed through the BRA.

The plaintiff asserts two alternative bases for standing, neither of which has any merit. First, he argues that he has standing under G. L. c. 121B, § 47, which permits any "person aggrieved" by an urban renewal agency's exercise of its eminent domain powers to take land it "has determined to be a decadent, substandard or blighted open area and for which it is preparing an urban renewal plan" to file a writ of certiorari challenging the taking under certain circumstances. As an initial matter, whether § 47 even applies in the instant case is less than clear, as there was no urban renewal plan involved and no taking of the plaintiff's property. See, e.g., St. Botolph Citizens Comm., Inc. v. Boston Redev. Auth., 429 Mass. 1, 11 n.11, 705 N.E.2d 617 (1999) (noting that c. 121B "provides a right of appeal in § 47 to aggrieved persons when an urban renewal agency has taken, or proposes to take, their land by eminent domain" [emphasis added] ); Benevolent & Protective Order of Elks, Lodge No. 65 v. Planning Bd. of Lawrence, 403 Mass. 531, 537, n.9, 531 N.E.2d 1233 (1988) (§ 47 "applies only where an urban renewal agency seeks to acquire land before" approval of urban renewal plan); Reid v. Acting Comm'r of the Dep't of Community Affairs, 362 Mass. 136, 140 n.2, 284 N.E.2d 245 (1972) ("§ 47 applies only where the agency seeks to acquire land before the plan is approved by the [D]epartment [of Housing and Community Development]"). Even assuming, without deciding, that § 47 applies here, however, for the reasons discussed supra, the plaintiff suffered no injury from the 2013 taking, and as such, he cannot plausibly be considered a "person aggrieved" under § 47.
Second, the plaintiff argues that he has standing under G. L. c. 249, § 4, which permits a party to bring "[a] civil action in the nature of certiorari to correct errors in proceedings" under certain circumstances. We note that the plaintiff did not file his complaint pursuant to G. L. c. 249, § 4, but rather pursuant to G. L. c. 121B, § 47. Nevertheless, even if we were to treat the claim as one for certiorari under G. L. c. 249, § 4, the plaintiff has failed to demonstrate standing under § 4. Certiorari review under § 4 "provides for limited judicial review ... to correct errors of law in administrative proceedings where judicial review is otherwise unavailable." Chardin v. Police Comm'r of Boston, 465 Mass. 314, 321 n.15, 989 N.E.2d 392, cert. denied, 571 U.S. 990, 134 S.Ct. 525, 187 L.Ed.2d 368 (2013). To obtain certiorari review of an administrative decision under G. L. c. 249, § 4, the following three elements must be present: "(1) a judicial or quasi judicial proceeding, (2) from which there is no other reasonably adequate remedy, and (3) a substantial injury or injustice arising from the proceeding under review." Indeck v. Clients' Security Bd., 450 Mass. 379, 385, 879 N.E.2d 57 (2008). Even assuming, without deciding, that the first two elements are met in this case, as explained supra, the plaintiff has failed to demonstrate that he suffered a legally cognizable injury as a result of the 2013 taking. Accordingly, G. L. c. 249, § 4, does not apply in this case.